NONCONFIDENTIAL VERSION

23-2094

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**CORINTH PIPEWORKS PIPE INDUSTRY SA, CPW AMERICA CO.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, THE AMERICAN LINE PIPE PRODUCERS ASSOCIATION TRADE COMMITTEE,**
*Defendants-Appellees*

---

Appeal from the United States Court of International Trade in
No. 1:22-cv-00063-LMG, Judge Leo M. Gordon

---

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS CORINTH PIPEWORKS PIPE INDUSTRY S.A. AND CPW AMERICA CO.**

Kristin H. Mowry
Jill A. Cramer
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
*Counsel to Plaintiffs-Appellants Corinth Pipeworks Pipe Industry S.A. and CPW America Co.*

September 29, 2023

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 23-2094

**Short Case Caption** Corinth Pipeworks Pipe Industry SA v. US

**Filing Party/Entity** Corinth Pipeworks Pipe Industry S.A. and CPW America Co.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/29/2023

Signature: /s/ Kristin H. Mowry

Name: Kristin H. Mowry

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Corinth Pipeworks Pipe Industry S.A. | | See Attachment |
| CPW America Co. | | See Attachment |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Jacob Max Reiskin<br>Kelley Drye & Warren LLP | Kimberly Rae Young<br>Vorys, Sater, Seymour and Pease, LLP | Frederick Paul Waite<br>Vorys, Sater, Seymour and Pease, LLP |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## ATTACHMENT TO QUESTION 3

Corinth Pipeworks Pipe Industry S.A. is wholly-owned by Cenergy Holdings S.A., and Cenergy Holdings S.A. is majority-owned by Viohalco S.A. Viohalco S.A. stock and Cenergy Holdings S.A. stock are both publicly traded. CPW America Co. is a wholly-owned subsidiary of Warsaw Tubulars Trading Sp.zo.o and Warsaw Tubulars is a wholly owned subsidiary of Corinth Pipeworks Pipe Industry S.A.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................ i

TABLE OF AUTHORITIES ........................................................ iii

STATEMENT OF RELATED CASES .................................................1

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF ISSUES .........................................................2

STATEMENT OF CASE AND FACTS RELEVANT TO THE ISSUES ......................2

SUMMARY OF ARGUMENT ......................................................12

ARGUMENT ..................................................................15

   I.  STANDARD OF REVIEW ................................................15

   II.  COMMERCE'S APPLICATION OF TOTAL AFA AGAINST CPW WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE COMMERCE FAILED TO PROVIDE CPW WITH AN OPPORTUNITY TO COMMENT ON THE ANALYSIS THAT LED TO COMMERCE'S CHANGE IN METHODOLOGY ................................................16

     A.  Commerce's Application of AFA Against CPW Was Not in Accordance with Law Because Commerce Failed To Meet the Requirements of 19 U.S.C. § 1677m(g).......................................................18

     B. Commerce's Application of AFA Against CPW Was Unsupported by Substantial Evidence Because Commerce Failed To Consider Information That Detracted From the Weight of its Conclusion ...............................27

   III.  COMMERCE'S APPLICATION OF TOTAL AFA AGAINST CPW WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE THE RECORD DOES NOT SUPPORT COMMERCE'S REQUIRED FINDINGS UNDER 19 U.S.C. § 1677E(A)................................................32

     A.  Commerce's Determination To Rely on Facts Otherwise Available Was Unsupported by Substantial Evidence.............................33

     B.  Commerce's Determination to Rely on an Adverse Inference Was Unsupported by Substantial Evidence.............................55

CONCLUSION AND RELIEF SOUGHT .............................................59

## CONFIDENTIAL MATERIALS OMITTED

Pursuant to Federal Circuit Rule 25.l(e)(l)(B), this brief contains confidential material that has been omitted at pages 38-39, 45.  The materials redacted from pages 38-39 relate to confidential numbers reported in the cost database. Finally, the materials redacted from page 45 refer to the time period of sales of large diameter welded pipe from Greece.

## TABLE OF AUTHORITIES

**Cases**

Carpenter Technology Corp. v. United States,
    477 F. Supp. 3d 1356 (Ct. Int'l Trade 2020)...................................... 28, 29, 30, 31

CC Metals & Alloys, LLC v. United States,
    145 F. Supp. 3d 1299 (Ct. Int'l Trade 2016).................................................. 28, 30

Changzhou Trina Solar Energy Co. v. United States,
    975 F.3d 1318 (Fed. Cir. 2020)....................................................................... 16, 28

Chapman v. Houston Welfare Rights Org.,
    441 U.S. 600 (1979)..................................................................................19

Chemtall, Inc. v. United States,
    878 F.3d 1012 (Fed. Cir. 2017)...............................................................23

Consol. Edison Co. v. NLRB,
    305 U.S. 197 (1938)..................................................................................16

Corinth Pipeworks Pipe Indus. SA v. United States,
    633 F. Supp. 3d 1314 (Ct. Int'l Trade 2023)................................................. passim

Gerber Food (Yunnan) Co. v. United States,
    387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005)...........................................56

Government of Argentina v. United States,
    542 F. Supp. 3d 1380 (Ct. Int'l Trade 2022)...........................................28

Hitachi Energy USA Inc. v. United States,
    34 F.4th 1375 (Fed. Cir. 2022)................................................................49

Home Prods. Int'l, Inc. v. United States,
    662 F. Supp. 2d 1360 (Ct. Int'l Trade 2009)...........................................23

Home Products Int'l, Inc. v. United States,
   556 F. Supp. 2d 1338 (Ct. Int'l Trade 2008)..................................... 22, 23, 24, 25

Huaiyin Foreign Trade Corp. v. United States,
   322 F.3d 1369 (Fed. Cir. 2003) ................................................................ 16, 34, 44

Hyundai Elec. & Energy Sys. v. United States,
   No. 2021-2312, 2022 U.S. App. LEXIS 22235 (Fed. Cir. Aug. 11, 2022)... 56, 57,
   58

Hyundai Heavy Indus. Co., Ltd. v. United States,
   527 F. Supp. 3d 1374 (Ct. Int'l Trade 2021)..........................................................58

JBF Rak LLC v. United States,
   991 F. Supp. 2d 1343 (Ct. Int'l Trade 2014)..........................................................28

Koyo Seiko Co., Ltd. v. United States,
   516 F. Supp. 2d 1323 (Ct. Int'l Trade 2007)................................................... 20, 21

Nan Ya Plastics Corp. v. United States,
   810 F.3d 1333 (Fed. Cir. 2016) ................................................................ 15, 50, 51

Nan Ya Plastics Corp. v. United States,
   906 F. Supp. 2d 1348 (Ct Int'l Trade 2013)...................................... 29, 30, 31, 50

NEC Corp. v. United States,
   151 F.3d 1361 (Fed. Cir. 1998)............................................................................52

Nippon Steel Corp. v. United States,
   337 F.3d 1373 (Fed. Cir. 2003) ................................................................ 50, 51, 56

Rhone-Poulenc v. United States,
   899 F.2d 1185 (Fed. Cir. 1990) ....................................................................... 21, 23

Schlumberger Tech. Corp. v. United States,
   845 F.3d 1158 (Fed. Cir. 2017) .............................................................................23

Shelter Forest Int'l Acquisition, Inc. v. United States,
  2022 U.S. App. LEXIS 16491 (Fed. Cir. 2022)......................................50

Shikoku Chems. Corp. v. United States,
  795 F. Supp. 417 (Ct. Int'l Trade 1992)..................................................21

SKF USA Inc. v. United States,
  263 F.3d 1369 (Fed. Cir. 2001) ...............................................................16

SKF USA Inc. v. United States,
  391 F. Supp. 2d 1327 (Ct. Int'l Trade 2005)........................................... 49, 50, 52

SolarWorld Ams., Inc. v. United States,
  910 F.3d 1216 (Fed. Cir. 2018) ...............................................................16

Tung Mung Dev. Co., Ltd. v. United States,
  354 F.3d 1371 (Fed. Cir. 2004) ............................................................... 15, 27

Zhejiang Dunan Hetian Metal Co. v. United States,
  652 F.3d 1333 (Fed. Cir. 2011) ............................................................... 56, 57, 58

**Statutes**

19 U.S.C. § 1516a ....................................................................................15

19 U.S.C. § 1677b......................................................................................6

19 U.S.C. § 1677e ................................................................ 8, 32, 33, 47

19 U.S.C. § 1677m................................................................... passim

28 U.S.C. § 1295 ........................................................................................1

28 U.S.C. § 1581 ........................................................................................1

28 U.S.C. § 2107 ........................................................................................1

**Other Authorities**

Large Diameter Welded Pipe from Greece, 86 Fed. Reg. 43,172 (Dep't of
Commerce Aug. 6, 2021) ............................................................... passim

Large Diameter Welded Pipe From Greece, 87 Fed. Reg. 7120 (Dep't Commerce
Feb. 8, 2022) .....................................................................................2, 32

Terephthalate Film, Sheet, and Strip From the United Arab Emirates, 78 Fed. Reg.
29,700 (Dep't Commerce May 21, 2013) ............................................52

Uruguay Round Agreements Act, H.R. Rep. No. 103-826, pt. 1 (1994)................19

Uruguay Round Agreements Act, S. Rep. No. 103-412, pt. 1 (1994) ....................20

## STATEMENT OF RELATED CASES

As required by Federal Circuit Rule 47.5(a), Plaintiffs-Appellants Corinth Pipeworks Pipe Industry S.A. and CPW America Co. (collectively "CPW") state that no other appeal in or from the same civil action or proceeding in the lower court or body was previously before the U.S. Court of Appeals for the Federal Circuit or any other appellate court. Further, counsel is not aware of any cases that could directly affect or be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

This action is an appeal from the final judgment and opinion of the U.S. Court of International Trade ("CIT") in Corinth Pipeworks Pipe Indus. SA v. United States, 633 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) ("CPW"), Appx00001-00013. The CIT had exclusive jurisdiction pursuant to 28 U.S.C. § 1581(c). This Court has jurisdiction to review decisions of the CIT pursuant to 28 U.S.C. § 1295(a)(5). This appeal is from a final judgment that disposes of all parties' claims. CPW timely filed this appeal pursuant to 28 U.S.C. § 2107(b) and Fed. R. App. P. 4(a)(1)(B) because CPW filed its notice of appeal on June 26, 2023 within 60 days of the CIT's April 28, 2023 final judgment.

**STATEMENT OF ISSUES**

This appeal raises two issues:

1. Whether application of adverse facts available ("AFA") against CPW by the U.S. Department of Commerce ("Commerce") was supported by substantial evidence and otherwise in accordance with law given that Commerce failed to provide CPW with an opportunity to comment on the analysis and calculations underlying Commerce's change in methodology to apply AFA against CPW in the Final Results?

2. Whether Commerce's determinations that CPW withheld information and impeded Commerce's investigation, failed to submit its cost reconciliation in the form and manner requested by Commerce, and did not cooperate to the best of its ability were supported by substantial evidence or otherwise in accordance with law?

**STATEMENT OF CASE AND FACTS RELEVANT TO THE ISSUES**

CPW challenges the Final Results of the first administrative review of the antidumping duty order on large diameter welded pipe from Greece. See Large Diameter Welded Pipe From Greece, 87 Fed. Reg. 7120 (Dep't of Commerce Feb. 8, 2022) ("Final Results"), Appx09023-09025, and accompanying Issues and Dec. Mem. ("Final I&D Mem."), Appx08993-09014.

As part of its review, Commerce seeks certain cost information from a respondent in Section D of the antidumping duty questionnaire. Commerce directs respondents to calculate and report in an electronic database the per-unit cost of production ("COP")[1] and constructed value ("CV")[2] (collectively, "cost data") for each control number ("CONNUM")[3] as defined in the questionnaire. See Letter from Commerce to CPW re: Questionnaire at D-1 to D-20 (July 17, 2020) ("Section D Questionnaire"), Appx00151-00170. Commerce requires respondents to develop these cost data using their normal cost and financial accounting systems. See id. CPW timely submitted its initial Section D response on September 21, 2020. See generally Large Diameter Welded Pipe from Greece, 86 Fed. Reg. 43,172 (Dep't of Commerce Aug. 6, 2021) ("Prelim. Results"), Appx08527-08528, and accompanying Prelim. Dec. Mem. at 2, n.9, Appx08181.

---

[1] COP "is the weighted-average CONNUM specific cost of the products sold by {a} company in the comparison am market." Section D Questionnaire at D-1, Appx00151.

[2] CV is the "weighted-average CONNUM specific cost of the product sold by {a} company in the U.S. market, plus an amount for profit." Section D Questionnaire at D-1, Appx00151.

[3] "A 'CONNUM' is a contraction of the term 'control number,' and is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding). All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as 'identical' merchandise for purposes of the price comparison." CPW, 633 F. Supp. 2d at 1317, n.5, Appx00004.

In submitting cost data, Commerce requires that a respondent demonstrate: (1) how the reported CONNUM-specific unit costs are derived from the costs recorded in its cost accounting system and (2) how the total pool of costs reported for all CONNUMs can be reconciled to the total costs booked in its cost accounting system and audited financial statements (financial accounting system). This second part is the cost reconciliation and Commerce will not consider costs to be verified without this reconciliation.

Commerce issued two supplemental questionnaires to CPW concerning its initial section D response. See Letter from Commerce to CPW re: Section Suppl. Section D Questionnaire (May 27, 2021) ("First Section D Suppl. Questionnaire"), Appx03929-03928; Letter on Behalf of Commerce to CPW re: Suppl. Section D Questionnaire (July 15, 2021) ("Second Section D Suppl. Questionnaire"), Appx06493-06497. CPW responded timely to Commerce's supplemental questionnaires. See Prelim. Dec. Mem. at 2, nn.11 & 13, Appx08181. In its responses, CPW explained that it had developed its reported cost data using its electronic accounting system (SAP system), its inventory ledger and its financial accounting system (trial balance and financial statements). See Letter on Behalf of CPW to Commerce re: Response to Section D at D-9, D-12, D-16, D-19, D-26 (Sept. 21, 2020), Appx03395, Appx03398, Appx03402, Appx03405, Appx03412; Letter on Behalf of CPW to Commerce re: Response to Suppl. Section D at (Supp. D)-8 to

4

(Supp. D)-9 (June 22, 2021) ("First Suppl. Section D Response Part 1"), Appx04249-04250; Letter on Behalf of CPW to Commerce re: Response to Suppl. Section D: Questions 9, 10, and 14 at (Supp. D)-6 to (Supp. D)-8, (Supp. D)-11 (June 25, 2021) ("First Suppl. Section D Response Part 2"), Appx05963-05965, Appx05968; Letter on Behalf of CPW to Commerce re: Response to Second Suppl. Section D at (2nd Supp D)-2 to (2nd Supp D)-9, (2nd Supp D)-13 to (2nd Supp D)-15 (July 22, 2021) ("Second Suppl. Section D Response"), Appx06986-06993, Appx06997-06999.

In its supplemental questionnaire responses, CPW provided Commerce with separate cost reconciliations for full year 2019 and the first four months of 2020, thereby capturing the entire span of Commerce's period of review ("POR") of April 19, 2019 through April 30, 2020.  See First Suppl. Section D Response Part 2 at Exs. (SUPP D)-9 and (SUPP D)-10, tabs "D,III,B4-5 Summary," Appx06139-06142, Appx06348-06352.    CPW generally followed the cost reconciliation format provided by Commerce in its supplemental cost questionnaire when preparing these reconciliations.  Compare id. at (Supp. D)-11, Appx05968, with id. at Exs. (SUPP D)-9 and (SUPP D)-10, tabs "D,III,B4-5 Summary," Appx06139-06142, Appx06348-06352.  The 2019 cost reconciliation reconciled to CPW's 2019 audited financial statement and the 2020 cost reconciliation reconciled to CPW's unaudited financial statement for the first four months of 2020.  See id. at Exs. (SUPP D)-9 and (SUPP D)-10, tabs "D,III,B4-5 Summary,"  Appx06139-06142, Appx06348-06352.

5

Both the 2019 and first four months of 2020 reconciliation started with CPW's costs of goods sold ("COGS") per the audited financial statement (or unaudited financial statement for 2020) and ended with CPW's reported cost of manufacture ("COM").[4] See id.

CPW explained in its supplemental questionnaire response that none of the subject CONNUMs sold during the POR was produced outside the POR and that there were no costs for large diameter welded pipe produced outside the POR included in CPW's reported COM. See Second Suppl. Section D Response at (2nd Supp D)-7 to (2nd Supp D)-8, (2nd Supp D)-13, Appx06991-06992, Appx06997.

In its pre-preliminary comments, the American Line Pipe Producers Association ("Petitioner") made general allegations concerning CPW's costs and requested that Commerce apply AFA based on Petitioner's conclusion that CPW's costs did not reconcile. See Letter on Behalf of Petitioner to Commerce re: Pre-Preliminary Comments at 1-8 (July 9, 2021), Appx06471-06478. In the Preliminary Results, Commerce rejected Petitioner's arguments that CPW's costs did not reconcile to its financial books and records and calculated CPW's dumping margin using CPW's reported cost data, resulting in a zero percent margin for CPW. See

---

[4] The COM equals the sum of "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business." 19 U.S.C. § 1677b(b)(3)(A).

Prelim. Results, 86 Fed. Reg. at 43,172, Appx08527; Prelim. Dec. Mem. at 4-7, Appx08183-08185. Commerce explained that it had requested, received and examined CPW's COP data. See Prelim. Dec. Mem. at 12, Appx08191. Commerce also stated that it had received a timely response to a second supplemental questionnaire concerning CPW's cost data but that because it was received shortly before the Preliminary Results, Commerce would consider that response for the Final Results. See id. at 2, Appx08181. Commerce did not, however, identify any deficiencies in CPW's reported cost data or indicate that Commerce believed those data did not reconcile to CPW's books and records. See generally id. at 2-8, Appx08181-08187. In the six months between the Preliminary Results and the Final Results, Commerce did not issue any further supplemental questionnaires to CPW or release a post-preliminary decision memorandum to identify perceived concerns with CPW's cost reconciliation. See generally Final I&D Mem. at 2, Appx08994.

In its case brief, the Petitioner made nearly identical arguments to its pre-preliminary comments claiming that Commerce should apply AFA against CPW because its reported cost data did not reconcile. See Letter on Behalf of Petitioner to Commerce re: Case Brief at 3-11 (Sept. 14, 2021), Appx08536-08554. CPW generally responded to the Petitioner's general arguments that CPW's costs did not reconcile. See Letter on Behalf of CPW to Commerce re: Rebuttal Brief at 2-7 (Sept. 28, 2021), Appx08566-08571.

Following the briefing deadline, Commerce placed new factual information on the record concerning CPW's margin calculation from the underlying investigation.  <u>See</u> Mem. from Josh Garten to the File re: Placing New Factual Information on the Record (Jan 26, 2022) ("New Factual Information"), Appx08600-08895.  Commerce permitted interested parties "to submit factual information to rebut, clarify, or correct this new factual information."  <u>Id.</u> at 1, Appx08600.  Consistent with Commerce's instructions, CPW submitted rebuttal factual information concerning the verification methodology employed by Commerce in the investigation.  <u>See</u> Letter on Behalf of CPW to Commerce re: Factual Information to Rebut, Clarify or Correct New Factual Information Placed on the Record at Ex. 1 (Jan. 31, 2022) ("Rebuttal Factual Information), Appx08904-08935.

In the Final Results, Commerce reversed course and assigned CPW a dumping margin based on total AFA citing section 776 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677e.  <u>See</u> Final I&D Mem. at 4, Appx08996.  Commerce found that CPW "failed to provide the necessary cost reconciliation in the form and manner requested," and that CPW "withheld requested information" and "significantly impeded the proceeding."  <u>Id.</u> at 4, Appx08996.  As AFA, Commerce selected a margin of 41.04 percent, the highest dumping margin alleged in the antidumping petition.  <u>See id.</u> at 8, Appx09000.

Commerce explained the basis of its decision to apply AFA in the Final Results Calculation Memorandum, which provided, for the first time, a new analysis of CPW's reported cost data and the reconciliation of those data to CPW's accounting and financial accounting systems. See Final Results Calc. Mem. at 1-4, Attachs. 1-4 ("Final Calc. Mem."), Appx09015-09020.    Rather than simply addressing parties' comments concerning the Preliminary Results or explaining how CPW's margin was computed, these calculations entailed an entirely new analysis and reconstruction of CPW's submitted cost reconciliations that had not previously been disclosed to CPW in the Preliminary Results or otherwise. See generally Final I&D Mem. at 1-2, Appx08993-08994; see also Final Calc. Mem. at Attachs. 1-2, Appx09019-09020.

In applying AFA against CPW, Commerce found that CPW's reported cost data included certain "double counted" costs after accounting for all reconciliation items and once these double-counted items were removed, CPW's cost database did not reconcile to its financial accounting system. See Final Calc. Mem. at 1-4, Appx09015-09018.    Commerce also faulted CPW's cost reconciliation for not excluding costs for the first quarter of 2019 (a period that was outside of the POR) and found that there were significant differences in materials and conversion costs reported in CPW's accounting and financial accounting systems. See id.

Following the Final Results, CPW submitted ministerial error comments identifying significant errors in the analysis and calculations presented in Commerce's Final Results Calculation Memorandum. See Letter on Behalf of CPW to Commerce re: Comments Regarding Significant Ministerial Error in Final Results at 1-9 (Feb. 9, 2022) ("CPW Ministerial Error Cmts"), Appx09026-09034. Specifically, CPW explained that Commerce's conclusion that CPW's reported costs included double-counted costs was incorrect and stemmed from a misunderstanding of CPW's accounting system. As explained in CPW's responses, the system recorded the accumulated costs at each production stage. See id. at 3, Appx09028. That is, the cost recorded for stage 1 would include the cost of input materials and other costs incurred in that stage. See id. at 3-8, Appx09028-09033; see also Oral Argument Slides at 2-4, Corinth Pipeworks Pipe Indus. SA v. United States, 633 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) (No. 22-00063) ("Oral Argument Slides"), Appx09307-09309. The cost recorded for stage 2 would include the accumulated costs at stage 1, plus the additional costs incurred at stage 2. See CPW Ministerial Error Comments at 4-8, Appx09029-09033. The cost recorded at stage 3 would include accumulated costs from stage 2 plus additional costs incurred at stage 3, and so on. See id. Thus, when calculating the cost of production for a product, it was necessary to net out the costs accumulated from earlier processes so that the cost of each production stage is captured only once. CPW had done so in developing its

reported costs.  See id. at 6-7, Appx09031-09032.  In calculating its own version of

the cost reconciliation, Commerce recognized the need to net out the costs

accumulated at intermediate production stages, but in doing so it mistakenly

deducted certain semi-finished pipe costs twice.  See Final Calc. Mem. at Attachs.

1-2, Appx09019-09020.  In twice deducting certain semi-finished pipe costs,

Commerce illogically found that the total production costs reported by CPW

exceeded the total pool of costs booked in the company's financial accounting

system.  Rather than realizing that it had deducted the same costs twice in the

reconciliation, Commerce erroneously determined that the problem was that CPW's

reported costs included "double-counted" production costs.  See id. at 1-4,

Appx09015-09018.  But for Commerce's error, CPW's costs fully reconciled.  See

Mem. of P&A in Support of Pls.' Mot. for J. on the Agency Record Pursuant to Rule

56.2 at Exs. 1-2, Corinth Pipeworks Pipe Indus. S.A. v. United States, 633 F. Supp.

3d. 1314 (Ct. Int'l Trade 2022) (No. 22-00063) ("CPW 56.2 Br."), Appx09157-

09173.  In response to CPW's ministerial error allegation, Commerce determined

that the errors identified by CPW were methodological, rather than ministerial, in

nature.  See Mem. from Paul Litwin to Jill E. Pollack re: Allegation of Ministerial

Error in the Final Results at 4 (Mar. 3, 2022) ("Ministerial Error Mem."),

Appx09048.  Commerce declined to consider CPW's arguments on the grounds that

Commerce is only permitted to examine ministerial errors in "addition, subtraction,

or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error." Id.

CPW timely appealed to the CIT. See generally CPW, 633 F. Supp. 3d at 1319-20, Appx00005. CPW argued that Commerce's application of AFA was unsupported by substantial evidence and otherwise not in accordance with law because Commerce did not provide CPW with an opportunity to comment on the calculations and conclusions reflected in Commerce's newly devised reconciliation table. CPW demonstrated that such disclosure was required by 19 U.S.C. § 1677m(g) and by the applicable standard of review. See CPW, 633 F. Supp. 3d at 1320, Appx00006. Further, CPW argued that Commerce's application of AFA against CPW was unsupported by substantial evidence because the only reasonable reading of the record was that its reported costs reconciled with its financial accounting system and, therefore, CPW cooperated to the best of its ability. See generally id. at 1325-26, Appx00009-00010. The CIT rejected CPW's arguments and sustained Commerce's determination to apply AFA against CPW. See id. at 1328, Appx00012. CPW subsequently timely appealed the CIT's judgment and opinion to this Court.

## SUMMARY OF ARGUMENT

Commerce's determination to apply AFA against CPW in the Final Results was flawed for two reasons. First, Commerce's application of AFA was unsupported

12

by substantial evidence and otherwise not in accordance with law because Commerce failed to provide CPW with an opportunity to comment on Commerce's calculations and analysis, which led to its determination in the Final Results that CPW's reported cost data and financial accounting system did not reconcile. The statute, 19 U.S.C. § 1677m(g) requires that interested parties have an opportunity to comment on all information serving as the basis for Commerce's determinations. This requirement applies to Commerce's reconciliation table and underlying analysis prepared for the Final Results because this information served as the basis for Commerce's determination to apply AFA against CPW. Both the legislative history and the CIT's past precedent, contrary to the CIT's holding, confirm that Congress intended the comment requirements of 19 U.S.C. § 1677m(g) to apply to information that Commerce itself places on the record. The comment requirements under 19 U.S.C. § 1677m(g) are consistent with the governing standard of review requiring that Commerce support its conclusions with substantial evidence. To be supported by substantial evidence, Commerce must consider all information that detracts from the weight of its conclusion and Commerce cannot meet this threshold without providing an opportunity to comment on information that serves as the basis for its determination. Further, a reviewing court applying the substantial evidence standard of review must have the benefit of Commerce's findings with respect to the issues and arguments raised by the parties. Here, Commerce's cost reconciliation contains

13

a fundamental error that led to Commerce's determination to apply AFA.  But CPW never had the opportunity to have that argument considered by Commerce before it issued its Final Results.  Commerce's failure to provide CPW with an opportunity to comment rendered its application of AFA against CPW unsupported by substantial evidence and otherwise not in accordance with law.

Second, Commerce's application of AFA against CPW was unsupported by substantial evidence and otherwise not in accordance with law because Commerce failed to support its required findings under 19 U.S.C. § 1677e(a) prior to applying AFA against CPW.  Commerce's application of facts otherwise available was misplaced because CPW did not withhold information, impede Commerce's investigation, or fail to submit information in the form and manner requested by Commerce.  CPW did not withhold or impede Commerce's investigation because it submitted a complete cost reconciliation.  Nor could any reasonable mind accept Commerce's conclusion that CPW's costs did not reconcile given that Commerce successfully reconciled CPW's cost data with its financial accounting system but for Commerce's clear error to twice remove the costs that go into CPW's production of semi-finished pipe.  Further, CPW submitted its cost reconciliation in the form and manner requested by Commerce by generally following Commerce's standard reconciliation template and providing a reasonable explanation for the need to submit two reconciliations.  Not only did Commerce not comply with its obligations

14

under 19 U.S.C. § 1677m(d) to provide CPW with notice and an opportunity to remedy Commerce's finding that CPW's cost reconciliation included certain "double counted costs," but CPW established a clear record by explaining how its reconciliation worksheets accounted for the accumulated costs recorded at intermediate production stages. Finally, Commerce's application of an adverse inference was unsupported by substantial evidence because CPW cooperated to the best of its ability by submitting a complete cost reconciliation. The record contained sufficient information for Commerce to determine that CPW's costs reconciled and, consequently, to rely on data submitted by CPW to calculate a dumping margin of zero percent for CPW as Commerce did in the Preliminary Results.

ARGUMENT

## I.    STANDARD OF REVIEW

The Court applies the same standard of review as the CIT. See Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1341 (Fed. Cir. 2016) ("Nan Ya II"). Under that standard, the Court sustains Commerce's administrative determination "unless it is arbitrary and capricious or unsupported by substantial evidence on the record, or otherwise not in accordance with law." Tung Mung Dev. Co., Ltd. v. United States, 354 F.3d 1371, 1378 (Fed. Cir. 2004) (internal citations omitted); see also 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence requires "more than a mere scintilla," see, e.g., Changzhou Trina Solar Energy Co. v. United States, 975 F.3d 1318, 1326 (Fed. Cir. 2020) (internal citation omitted) and must be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence supporting an agency determination must be based on the whole record, and the Court shall consider not only the information that supports the agency's decision but also whatever in the record that "fairly detracts from the substantiality of the evidence." Changzhou Trina, 975 F.3d at 1326 (quoting SolarWorld Ams., Inc. v. United States, 910 F.3d 1216, 1222 (Fed. Cir. 2018)). Further, this Court "review{s} questions of statutory interpretation without deference." SKF USA Inc. v. United States, 263 F.3d 1369, 1378 (Fed. Cir. 2001).

## II.    COMMERCE'S APPLICATION OF TOTAL AFA AGAINST CPW WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE COMMERCE FAILED TO PROVIDE CPW WITH AN OPPORTUNITY TO COMMENT ON THE ANALYSIS THAT LED TO COMMERCE'S CHANGE IN METHODOLOGY

Commerce's application of AFA against CPW was unsupported by substantial evidence and otherwise not in accordance with law because CPW was not given an opportunity to comment on the clear error in Commerce's analysis provided for the first time in the Final Results. In the Preliminary Results, Commerce accepted

CPW's costs as submitted and calculated a zero percent dumping margin.  See Prelim. Results, 86 Fed. Reg. at 43,172, Appx08527.  In the Final Results, however, Commerce simply determined that CPW's costs did not reconcile and thus applied AFA against CPW without affording CPW the opportunity to comment on Commerce's changed methodology from the Preliminary Results.  See Final I&D Mem. at 4, Appx08996.  In performing its own calculation of how to reconcile CPW's submitted costs, Commerce deducted the cost of production of semi-finished pipe twice (referred to as "double counted" costs by Commerce), leading to the erroneous conclusion that CPW's cost data did not reconcile with its books and records.  Following CPW's submission of ministerial error comments, the agency declined to address CPW's allegation of significant errors on the merits, finding only that the issue CPW raised was methodological, not ministerial in nature.  See Ministerial Error Mem. at 4, Appx09048.  At the CIT, the United States also failed to provide any explanation on whether Commerce erred in its reconciliation analysis and double deducted the semi-finished pipe.  See Def.'s Resp. to Pl.'s Mot. for J. on the Admin. Rec. at 3-14, Corinth Pipeworks Pipe Indus. SA v. United States, 633 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) (No. 22-00063), Appx09058-9069.  Commerce failed to provide CPW with an opportunity to comment on Commerce's calculations and analysis that led to Commerce applying AFA against CPW as mandated by both 19 U.S.C. § 1677m(g) and the requirement codified in the applicable standard of

review that Commerce support its determination with substantial evidence.  It was Commerce's mistaken belief that CPWs costs did not reconcile, based on Commerce's double deduction of the cost of semi-finished pipe, that led Commerce to apply AFA.  Had CPW been given an opportunity to comment on the Commerce's underlying analysis leading to Commerce incorrectly twice removing CPW's "double counted" costs in its reconciliation, CPW could have corrected Commerce's error and shown that its cost database reconciled with its financial accounting systems.

### A. Commerce's Application of AFA Against CPW Was Not in Accordance with Law Because Commerce Failed To Meet the Requirements of 19 U.S.C. § 1677m(g)

Commerce did not comply with the requirements of 19 U.S.C. § 1677m(g) by depriving CPW of an opportunity to comment on information serving as the basis for Commerce's determination to apply AFA.  Specifically, Commerce did not disclose to CPW the newly created reconciliation table and the underlying analysis that Commerce performed therein to conclude that CPW's reported costs did not reconcile with its financial accounting system.  This Court should reject the CIT's holding that Commerce's reconciliation table released in the Final Results does not constitute the type of "information" subject to the notice requirements of 19 U.S.C. § 1677m(g) as it conflicts with the purpose of the statute and the CIT's own precedent.

18

Congress enacted 19 U.S.C. § 1677m(g) to ensure that parties have an opportunity to comment on information that serves as the basis for Commerce's determinations.  Courts are obligated to "interpret the words of . . . statutes in light of the purposes Congress sought to serve."  Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608 (1979).  Under 19 U.S.C. § 1677m(g):

> The administering authority and the Commission, before making a final determination under section 1671d, 1673d, 1675, or 1675b of this title shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority or the Commission (as the case may be) upon which the parties have not previously had an opportunity to comment. Comments containing new factual information shall be disregarded.

Id.  Although the statute does not define "information," the legislative history underlying 19 U.S.C. § 1677m(g) confirms that Congress intended for "information obtained by the administering authority" to be broadly applicable to cover information that Commerce itself places on the record.  For instance, in summarizing the proposed changes to the Tariff Act in the Uruguay Round Agreements Act ("URAA"), the House of Representativeness explained that its proposed bill added section 782(g), codified in 19 U.S.C. § 1677m(g), to "implement the requirement that all interested parties be informed of the essential facts under consideration that form the basis for a determination in sufficient time to defend themselves."  URAA, H.R. Rep. No. 103-826, pt. 1, at 76 (1994) (emphasis added).  Similarly, in its comments on the URAA, the Senate emphasized that section 782(g) was added to

"ensure that all parties will have an opportunity to comment on <u>any</u> factual information that will form the basis of the agency's decision."  URAA, S. Rep. No. 103-412, pt. 1, at 59 (1994) (emphasis added).  Congress's reference to "essential facts" and "<u>any</u> factual information" demonstrates that it intended for the comment requirements of 19 U.S.C. § 1677m(g) to apply to all information on the record regardless of whether Commerce itself or another interested party put that information on the record.

The comment requirement under 19 U.S.C. § 1677m(g) in particular applies to information that serves as the basis for a change in methodology by Commerce.  <u>See</u> <u>Koyo Seiko Co., Ltd. v. United States</u>, 516 F. Supp. 2d 1323, 1333 (Ct. Int'l Trade 2007) ("In order to change its methodology, Commerce must provide the affected parties with notice and the opportunity to comment before the final determination is made." (citing to 19 U.S.C. § 1677m(g)).  The CIT's interpretation of 19 U.S.C. § 1677m(g) in <u>Koyo</u> comports with the underlying purpose of the statute to provide interested parties with an opportunity to comment on information that serves as the basis for Commerce's underlying determinations.  The holding in <u>Koyo</u> is also consistent with Commerce's underlying obligation to calculate

dumping margins as accurately as possible.  See, e.g., Rhone-Poulenc v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).[5]

Here Commerce did not afford CPW with an opportunity to comment on Commerce's reconciliation table that included its methodological change to reconstruct the reconciliation of CPW's submitted costs in a manner that double-deducted semi-finished pipe costs.  Cf. Koyo, 516 F. Supp. 2d at 1333-34.  That change in methodology led directly to Commerce's conclusion that CPW's costs did not reconcile.  Commerce itself recognized its decision to twice subtract semi-finished pipe in its cost reconciliation table was methodological in nature. See Ministerial Error Mem. at 4, Appx09048.[6]  Commerce's determination to apply AFA against CPW was not in accordance with law because it failed to provide CPW with an opportunity to comment on the cost reconciliation table that served as the basis for Commerce's change in methodology in the Final Results to find that CPW's costs did not reconcile.

---

[5] The CIT wrongly concluded that CPW's reliance on Koyo was "unavailing" because Koyo relied on Shikoku Chems. Corp. v. United States, 795 F. Supp. 417, 421 (Ct. Int'l Trade 1992) and "Shikoku turned on a showing of detrimental reliance."  CPW, 633 F. Supp. 3d at 1322, Appx00007.  CPW relied on the cost reconciliation methodology employed by Commerce in the initial investigation when preparing the cost reconciliation submitted with its antidumping response as well as Commerce using CPW's data in the Preliminary Results as set forth below.

[6] In rejecting CPW's ministerial error comments as "methodological in nature," Commerce noted that "Corinth disagrees with the methodology that we employed in our analysis of the reconciliations that they provided to Commerce during the proceeding."  Ministerial Error Mem. at 4, Appx09048 (emphasis added).

In its opinion below, the CIT found that 19 U.S.C. §1677m(g) did not apply to information placed on the record by Commerce.  See CPW, 633 F. Supp. 3d at 1320-21, Appx00006-00007.  This Court should reject that interpretation of 19 U.S.C. § 1677m(g) because it conflicts with the Congressional purpose of ensuring that interested parties have an opportunity to comment on all information serving as the basis for Commerce's determinations.  The CIT has previously found that Commerce must provide an opportunity for interested parties to comment on information that Commerce put on the record.  See Home Prods. Int'l, Inc. v. United States, 556 F. Supp. 2d 1338, 1340 (Ct. Int'l Trade 2008) ("Home Products I").  In the Final Results in the administrative proceeding underlying Home Products I, Commerce reversed its determination in the preliminary results to use a respondent's market-economy purchases of an input and instead "developed a new methodology to evaluate the reliability of Respondent's input purchases paid to a supplier located in a market economy but substantially owned by nonmarket, economy entities." Id. at 1340.  Commerce established a "benchmark of international market prices derived from annualized export statistics and then compared Respondent's input purchases against the benchmark." Id.  During litigation, the CIT granted Commerce's request for a voluntary remand noting that "Commerce acknowledges that interested parties did not have an opportunity to comment upon the benchmark information prior to

the Final Results as required by 19 U.S.C. § 1677m(g)." Home Products I, 556 F. Supp. 2d at 1340.

By granting Commerce's request for voluntary remand, the CIT properly recognized in Home Products I that Commerce must provide an opportunity to comment on information that it itself places on the record. Such an interpretation is consistent with the underlying Congressional purpose that interested parties should be able to comment on all information that serves as a basis for Commerce's determinations. See Chemtall, Inc. v. United States, 878 F.3d 1012, 1018 (Fed. Cir. 2017) (stating that this Court "give{s} great weight to the informed opinion' of {the CIT}, which has expertise in international trade matters" (quoting Schlumberger Tech. Corp. v. United States, 845 F.3d 1158, 1162 (Fed. Cir. 2017)). The requirement that Commerce must allow parties to comment on information it places on the record is also consistent with Commerce's underlying obligation to "determine{} current margins as accurately as possible." Rhone-Poulenc, 899 F.2d at 1191. In fact, in its remand redetermination following the CIT's judgment in Home Products I, Commerce found that the methodology it employed for the first time in the Final Results "defied commercial reality" after receiving comments from all parties and returned to the methodology it followed in the preliminary results. See Home Prods. Int'l, Inc. v. United States, 662 F. Supp. 2d 1360, 1363 (Ct. Int'l Trade 2009). Here too, had Commerce provided CPW with an opportunity to comment on its change in

methodology to twice remove CPW's costs of semi-finished pipe, CPW could have demonstrated that its costs reconciled, allowing Commerce to adhere to its methodology from the Preliminary Results to rely on CPW's reported reconciliation to calculate a zero percent dumping margin.

The CIT erred below in holding that Home Products I involves "distinguishable circumstances warranting compliance with § 1677m(g)." CPW, 633 F. Supp. 3d at 1321-22, Appx00007. The information that Commerce placed on the record in the administrative proceeding underlying Home Products I, a benchmark of international market prices, cannot be persuasively distinguished from the information that Commerce placed on the record in the administrative proceeding challenged here. In the review challenged here, the information consisted of a schedule detailing Commerce's own calculation and an analysis for determining whether CPW's costs reconciled with its financial accounting system. See Final Calc. Mem. at Attachs. 1-2, Appx09019-09020. This was information not previously disclosed to the parties, and it was information that proved outcome-determinative regarding whether Commerce would rely on CPW's submitted data to calculate its dumping margin in the Final Results. The CIT incorrectly concluded that Commerce did not place "information" on the record requiring disclosure and the opportunity to comment because "{w}hen Commerce calculates margins it generates information; it does not collect information." CPW, 633 F. Supp. 3d at

24

1321, Appx00007 (citation omitted).  Here, the information at issue was <u>not</u> the calculation of a dumping margin.  Commerce did not calculate any dumping margin in the Final Results.  Instead, it assigned CPW an antidumping duty rate based on AFA.  <u>See</u> Final I&D Mem. at 7, Appx08999.  Rather than generating a dumping margin, the analysis here constituted a new reconciliation table of Commerce's devising that presented a new methodology for reconciling the figures that had not been used in the Preliminary Results or otherwise disclosed to the parties.  <u>See</u> <u>id.</u> This is precisely the sort of information that must be disclosed <u>before</u> Commerce relies upon it as the basis for determining that the costs on the record did not reconcile.[7]

Putting aside the fact that Commerce's reconciliation table went beyond mere calculations by containing Commerce's own analysis, Commerce itself recognized in this case that even its own calculations require an opportunity for comment. Following the briefing deadline, Commerce placed CPW's margin calculations on the record from the prior investigation.  <u>See</u> New Factual Information at Attach., Appx08601-08895.  Commerce allowed interested parties to comment on this information.  <u>See</u> <u>id.</u> at 1, Appx08600.  Commerce, however, failed to provide CPW

---

[7]  In <u>Home Products I</u>, like the reconciliation table that Commerce placed on the record here, the benchmark of international market prices served as the basis for Commerce's methodological choice for whether it used the respondent's purchase price of an input or a surrogate value price.

with a similar opportunity to comment on Commerce's methodological choice to deviate from CPW's submitted cost reconciliation worksheets by twice deducting CPW's semi-finished product costs.  <u>Compare</u> <u>Prelim. Results</u>, 86 Fed. Reg. at 43,172, Appx08527, <u>with</u> Final Calc. Mem. at Attachs. 1-2, Appx09019-09020.

In sum, Commerce's application of AFA against CPW was unsupported by substantial evidence and otherwise not in accordance with law because Commerce failed to comply with the requirements of 19 U.S.C. § 1677m(g) by not providing CPW with an opportunity to comment on Commerce's reconciliation table and underlying analysis that served as the basis for Commerce finding that CPW's costs did not reconcile.  But for Commerce's methodological choice to deduct two times the costs production of semi-finished pipe (again, referred to by Commerce as "double counted" costs), Commerce would have realized that CPW's costs fully reconciled.  <u>See</u> CPW 56.2 Br. at Ex. 1, Appx09157-09165 (showing how CPW's costs fully reconciled but for Commerce's mistaken assumption).  The CIT wrongly affirmed Commerce's decision by misapplying the statute and ignoring persuasive precedent.  This Court should find that a remand is necessary to provide CPW with the statutorily required opportunity to comment on Commerce's determination to twice deduct semi-finished pipe and for Commerce to reconsider its determination that CPW's reported cost data did not reconcile with its financial accounting system.

**B. Commerce's Application of AFA Against CPW Was Unsupported by Substantial Evidence Because Commerce Failed To Consider Information That Detracted From the Weight of its Conclusion**

The statutorily required opportunity for parties to comment on information on the record under 19 U.S.C. § 1677m(g) is consistent with the requirement codified in the applicable standard of review that Commerce must support its determinations with substantial evidence. See Tung Mung, 354 F.3d at 1378. It is undisputed that Commerce changed its methodology between the Preliminary Results and Final Results to rely on AFA based on its conclusion that CPW's costs did not reconcile. Even if this Court disagrees that Commerce's reconciliation table constitutes information requiring an opportunity for comment under 19 U.S.C. § 1677m(g), the requirement that Commerce support its determination with substantial evidence, which is codified in the applicable standard of review, necessitates that Commerce provide CPW with an opportunity to comment on Commerce's finding that CPW's costs did not reconcile. Commerce's failure to provide CPW with an opportunity for comment thereby rendered its application of AFA against CPW unsupported by substantial evidence.

Although Commerce may lawfully change a finding between the preliminary and final results, Commerce must nonetheless provide interested parties with an opportunity to comment on a change in methodology to support its decision with substantial evidence. Cf. CPW, 633 F. Supp. 3d at 1323, Appx00008 (noting that it

27

is well established that Commerce may change its stance between the preliminary

and final results).[8]   To be supported by substantial evidence, Commerce must

consider information that detracts from the weight of its determinations.   See

generally Changzhou Trina, 975 F.3d at 1326.   Here, Commerce's determination to

apply AFA against CPW was unsupported by substantial evidence because

Commerce failed to provide CPW with an opportunity to comment on Commerce's

change in methodology to twice remove CPW's "double counted" costs such that

Commerce found that CPW's cost database no longer reconciled with its financial

accounting system.

The CIT has long recognized that Commerce must provide interested parties

with an opportunity to comment on a change in methodology to meet the requisite

threshold of supporting its determinations with substantial evidence.   See Carpenter

Tech. Corp. v. United States, 477 F. Supp. 3d 1356, 1359-61 (Ct. Int'l Trade 2020);

CC Metals & Alloys, LLC v. United States, 145 F. Supp. 3d 1299, 1310-11 (Ct. Int'l

Trade 2016); Nan Ya Plastics Corp. v. United States, 906 F. Supp. 2d 1348, 1354 (Ct

---

[8]  Indeed, in both Government of Argentina v. United States, 542 F. Supp. 3d 1380 (Ct. Int'l Trade 2022) and JBF Rak LLC v. United States, 991 F. Supp. 2d 1343 (Ct. Int'l Trade 2014), which the CIT cited below to support its holding that Commerce may change its stance between the preliminary and final results, Commerce provided the respondents with an opportunity to comment.   See Gov't of Argentina, 319 F. Supp. 3d at 1387-88 (listing the additional information placed on the record that interested parties were able to comment on); JBF Rak, 991 F. Supp. 2d at 1347 (indicating that Commerce issued a post-preliminary determination that parties were able to comment on).

Int'l Trade 2013) ("Nan Ya I"). The CIT below dismissed these cases because they did not rely on 19 U.S.C. § 1677m(g). See CPW, 633 F. Supp. 3d at 1322, Appx00007. To the contrary, the holdings in Carpenter and Nan Ya I, where the CIT concluded that a determination by Commerce cannot be supported by substantial evidence when Commerce failed to provide a party with an opportunity to comment on a change in methodology, are particularly persuasive here.

In Carpenter, which the CIT failed to discuss below, the plaintiffs challenged Commerce's revised method of selecting partial adverse facts available in the final results. See Carpenter, 477 F. Supp. 3d at 1359-61. Instead of using the highest non-aberrational transaction specific margin to determine the sales at issue, Commerce reversed its methodology in the final results to calculate a surrogate cost production of production for these sales using information already on the record from the other cooperating respondent. See id. at 1361. Similarly, in Nan Ya I, which the CIT wrongly dismissed below as not invoking 19 U.S.C § 1677m(g), Commerce made a significant change in the AFA rate it applied between the preliminary and final results. See Nan Ya I, 906 F. Supp. 2d at 1354. In the final results in the administrative proceeding underlying Nan Ya I, Commerce reversed course from deriving an AFA rate based on data from the prior review to instead using the highest transaction-specific margin calculated for the other cooperating respondent in the current review. See id. at 1350-51. In both Carpenter and Nan Ya I, despite

29

Commerce making a methodological change based only on Commerce's own calculations using data on the record, the CIT held that Commerce did not support its change in methodologies with substantial evidence because it failed to provide parties with an opportunity to comment. See Carpenter, 477 F. Supp. 3d at 1362 (concluding that the United States would have a "limited ability to defend Commerce's determination because, by adopting the new methodology in its Final Results, Commerce did not have an opportunity to address Plaintiffs' arguments"); Nan Ya I, 906 F. Supp. 2d at 1354 ("Because Commerce changed the AFA rate from the preliminary results to the final, Nan Ya's first opportunity to challenge the total AFA rate was in its brief before the court. This means that the agency has not had the opportunity to consider these arguments in the first instance"); see also CC Metals, 145 F. Supp. 3d at 1311 (remanding where Commerce did not have the opportunity to consider a respondent's arguments "in the first instance"). These holdings are persuasive.

Commerce's determination to apply AFA against CPW suffers from the same flaw as the CIT found in Carpenter and Nan Ya I. Commerce changed its methodology from finding that Commerce's costs reconciled in the Preliminary Results (resulting in a calculated zero percent dumping margin) to finding that CPW's costs did not reconcile based on Commerce's determination to twice remove CPW's "double counted" costs in the Final Results (resulting in an assigned dumping

30

margin of 41.04 percent to CPW based on AFA).  Compare Prelim. Results, 86 Fed.

Reg. at 43,172, Appx08527, with Final Calc. Mem. at Attachs. 1-2, Appx09019-

09020.  Commerce's reconciliation table issued with the Final Results, containing

Commerce's analysis of CPW's reported cost reconciliation, is the equivalent of the

Commerce's own calculations that incorporated data on the record from the

respondents in the administrative proceedings underlying Carpenter and Nan Ya I.

See Carpenter, 477 F. Supp. 3d at 1361, n.7 (noting that Commerce calculated a

surrogate cost of production for certain sales in the final results using data from a

respondent); Nan Ya I, 906 F. Supp. 2d at 1351 (using data on the record from the

other cooperating respondent to select its AFA rate from the highest transaction-

specific margin).  In the administrative review challenged here, Commerce failed to

support its determination that CPW's costs did not reconcile by denying CPW the

opportunity to comment on the lynchpin behind its change in methodology –

Commerce's determination to twice remove CPW's semifinished pipe costs (what

Commerce considered to be "double counted" costs) as presented in Commerce's

cost reconciliation table.  See Final Calc. Mem. at Attachs. 1-2, Appx09019-09020.

Commerce's application of AFA against CPW was unsupported by substantial

evidence and otherwise not in accordance with law because Commerce failed to

provide CPW with an opportunity to comment on its change in methodology

between the Preliminary and Final Results.  As a result, neither the CIT below nor

this Court is able to review CPW's argument that Commerce made a fundamental error in its reconciliation calculations because Commerce has yet to consider CPW's arguments and reach a determination regarding the validity thereof. This Court should, therefore, find that a remand is necessary for Commerce to consider CPW's arguments that its costs fully reconciled.

## III. COMMERCE'S APPLICATION OF TOTAL AFA AGAINST CPW WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW BECAUSE THE RECORD DOES NOT SUPPORT COMMERCE'S REQUIRED FINDINGS UNDER 19 U.S.C. § 1677E(A)

Commerce's determination to apply total AFA against CPW, as sustained by the CIT, was unsupported by substantial evidence and otherwise not in accordance with law because the record does not support Commerce's predicate findings under 19 U.S.C. § 1677e. See Final Results, 87 Fed. Reg. at 7121, Appx09024; CPW, 633 F. Supp. 3d at 1323-28, Appx00008-00012. Before applying total AFA against a party, Commerce must make two separate inquiries. First, before it can apply facts otherwise available, Commerce must determine if:

(1) necessary information is not available on the record, or
(2) an interested party or any other person—

(A) withholds information that has been requested by the administering authority or the Commission under this subtitle,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested subject to subsections (c)(1) and (e) of section 1677m of this title,

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be
verified as provided in section 1677m(i) of this title

19 U.S.C. § 1677e(a). Commerce's authority to rely on facts otherwise available is subject to 19 U.S.C. § 1677m(d). Second, if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may use an adverse inference against that non-cooperative party when selecting from the facts otherwise available. 19 U.S.C. § 1677e(b). Commerce failed to support with substantial evidence its determination regarding either inquiry for the reasons set forth below.

### A. Commerce's Determination To Rely on Facts Otherwise Available Was Unsupported by Substantial Evidence

Commerce applied facts otherwise available against CPW because it found that: 1) CPW withheld information and impeded Commerce's investigation by failing to provide a cost reconciliation (19 U.S.C. § 1677e(a)(2)(A) and (C)) and 2) CPW failed to provide the necessary cost reconciliation in the form and manner requested (19 U.S.C. § 1677e(a)(2)(B)). See Final I&D Mem. at 4-6, Appx08996-08998. Commerce's determination to apply facts otherwise available against CPW was unsupported by substantial evidence because no "reasonable mind" could accept that the record can support Commerce's finding that CPW did not submit a complete cost reconciliation that fully reconciled or that CPW's did not submit its

reconciliation in the form and manner requested by Commerce.  Huaiyin, 322 F.3d

at 1374.

### 1. CPW Did Not Withold Information or Impede Commerce's Investigation Because CPW's Cost Database Reconciled With its Financial Accounting System

As summarized by the CIT below, Commerce faulted CPW's submitted cost

reconciliation worksheets because 1) CPW's accounting system showed that the total

COM reported by CPW in its cost database included "double counted" costs, 2) once

these "double counted" costs were removed, the costs and quantities reported in

CPW's cost database did not reconcile with its financial accounting system and 3)

there were "significant differences in materials and conversion costs" between

CPW's audited financial statements and its accounting system.  CPW, 633 F. Supp.

3d at 1319, Appx00005 (quoting Final Calc. Mem. at 2-4, Appx09016-09018).  No

"reasonable mind," however, could accept that Commerce supported its conclusion

that CPW's costs did not fully reconcile with substantial evidence given that

Commerce made a clear error to twice deduct CPW's semi-finished pipe costs.

Huaiyin, 322 F.3d at 1374.

CPW provided detailed explanations demonstrating the flaws in Commerce's

conclusions in its arguments before the CIT.  See CPW 56.2 Br. at 13-25, Ex. 1,

Appx09124-09136, Appx09157-09165.  CPW's explanations all contained citations

to the underlying record to show that CPW submitted a complete reconciliation.  See

id. The CIT did not reject these arguments on the merits. Instead, the CIT erroneously concluded CPW's arguments "only serve to support the finding that {CPW}'s submissions were inadequate." CPW, 633 F.3d at 1326, Appx00010. To the contrary, it was Commerce's calculations that were inadequate by containing clear errors. Had Commerce disclosed its calculations to CPW in a timely manner, CPW would have called to Commerce's attention the double-deduction of the semi-finished pipe costs, and Commerce's unlawful AFA finding (and the ensuing litigation) could have been avoided.

Commerce made one simple error in its attempt to recreate CPW's reconciliation worksheets - it twice subtracted CPW's "double counted" costs associated with the production of semi-finished pipe. This is not an instance of CPW advocating for "an alternative means of analyzing the submitted data," but instead the only reasonable reading of the record was that Commerce erred in twice deducting CPW's "double counted" costs. Id. at 1326, Appx00010 (emphasis removed). Commerce's improper additional adjustment resulted in it excluding the actual cost of semi-finished goods consumed in the production of finished pipe. See CPW 56.2 Br. at Ex. 1, Appx09157-09165 (highlighting in yellow the error committed by Commerce). But for this error, Commerce would have easily recognized that CPW's reported costs fully reconciled.

CPW's accounting system (SAP system) accumulates the total costs at each production stage, even though those costs have already been cumulated and recorded at a prior production stage.  See Section D Response at D-27, Appx03413; First Suppl. Section D Response Part 1 at (Supp. D)-2, Appx04243; Second Suppl. Section D Response at (2nd Supp D)-2 to (2nd Supp D)-3, Ex. (2nd Supp D)-3, Appx06986-06987, Appx07027-07035; see also Oral Argument Slides at 2-4, Appx09307-09309 (summarizing the accumulation of costs in CPW's system).  By way of example, CPW uses certain raw materials to produce bare pipe.  See Oral Argument Slides at 2-4, Appx09307-09309.  CPW's accounting system records the costs accumulated as bare pipe.  See CPW's 56.2 Br. at 20, Appx09131.  The bare pipe can then be sold or further processed into coated pipe.  See id.  CPW's accounting system then separately records the full cost of the production of coated pipe (including the full cost of the inputs and production that was accounted for in the production of bare pipe).  See id.; see also Oral Argument Slides at 2-4, Appx09307-09309.  Finally, CPW's coated pipe undergoes further processing into the final lined pipe and the costs are once again separately recorded in CPW's accounting system (including the full cost of the inputs and production that was accounted for in the production of bare and line pipe).  See Oral Argument Slides at 2-4, Appx09307-09309.  This process can be summarized in the chart below:



Id., Appx09308-09309.  In other words, the total costs incurred through each processing stage (3,050 above), not the incremental costs (1,250), are accumulated at each stage of further processing in CPW's accounting system.  It is in this sense, that on aggregate, CPW's accounting system initially "double-counts" the production costs for those products that pass through multiple production stages.  This "double-counting" is purely presentational.  It does not affect the manner in which costs are reported in the inventory records or in the financial data that CPW used in its cost reconciliation, in which the costs at each stage are captured only once, and the costs accumulated at multiple stages are netted out for the finished product.

37

Commerce's error occurred in its adjustment for "double counted" semi-finished costs.  In the Final Results, Commerce analyzed CPW's submitted cost reconciliation and was able to reconcile CPW's COGS presented on its 2019 and 2020 (first four months) financial statements and trial balances to the total costs reported in CPW's accounting system.  See Final Calc. Mem. at Attachs. 1-2, Appx09019-09020.  Commerce then proceeded to analyze whether the total COM recorded in CPW's accounting system for CPW's production of large diameter welded pipe and the total COM that CPW submitted to Commerce in its cost database reconciled.  See id.  Commerce correctly recognized that the total COM extracted from CPW's accounting system included "double counted" costs for merchandise that underwent further processing after the bare pipe stage.  See id.  As a result, to reconcile the total COM extracted from CPW's accounting system to the COM that CPW reported to Commerce in its cost database, this category of costs had to be deducted.  Commerce properly deducted out of costs in CPW's accounting system the "double counted" semi-finished costs at annotations o through s in its cost reconciliation.  See id.  Had Commerce correctly stopped there, Commerce would have been successful in reconciling the total COM as recorded in CPW's accounting system to the total COM reported in CPW's cost database (shown in the 1,250 amount in the example above).  See id. at Attach. 1, Appx09019 (showing a cost from CPW's accounting system for 2019 of [ cost data ] versus a total of

CONFIDENTIAL MATERIAL CONTAINED
IN BRACKETS HAS BEEN OMITTED

[ cost data ] reported in the cost database); Attach. 2, Appx09020 (showing a cost from CPW's accounting for the first four months of 2020 of [ cost data ] versus a total of [ cost data ] reported in the cost database).

Commerce, however, proceeded to subtract what it mistakenly characterized as "double counted" costs at annotations q and u. Id. at Attachs. 1-2, Appx09019-09020. The additional costs Commerce mistakenly deducted were not "double counted" costs at all, but rather the actual build up costs incurred to produce bare pipe (raw materials plus conversion costs) that was further processed to produce coated or large diameter welded pipe (shown in the 450 amount in the example above). Commerce's error should have been obvious because twice subtracting the costs yielded an impossibly low cost that was a fraction of both CPW's actual costs and its selling price. See CPW's 56.2 Br. at 24, n.9, Appx09135. Concerning conversions costs, Commerce erroneously concluded that the conversion costs would be the same for both large diameter welded pipe and non-subject merchandise, a plain error not supported by the facts on the record. See id. at 28-29, Appx09139-09140.

In sum, Commerce's assertion that CPW somehow "withheld" the information needed to confirm this point is contradicted by the fact that the reconciliation table created by Commerce has all of the figures needed to reconcile CPW's costs. Commerce made a clear error in twice deducting CPW's semi-finished

39

pipe costs, an error that could have been avoided had it allowed CPW to comment on the reconciliation schedule. CPW, therefore, did not withhold information or impede Commerce's investigation because it submitted a full cost reconciliation that demonstrated that its reported cost database reconciled with its financial accounting system.

### 2. CPW Submitted Its Cost Reconciliation in the Form and Manner Requested by Commerce

CPW also did not fail to provide information in the form and manner requested by Commerce. CPW followed Commerce's general reconciliation template in the antidumping questionnaire subject only to slight deviations that CPW explained were consistent with Commerce's past methodology employed in the initial investigation phase. Commerce nevertheless faulted the form and manner that CPW submitted its cost reconciliation for two reasons: First, Commerce found that CPW failed to provide one complete reconciliation and instead included two reconciliations for different parts of the POR (i.e., one reconciliation for fiscal year 2019 and one for the first four months of 2020). See Final I&D Mem. at 12, Appx09004; see also First Suppl. Section D Response Part 2 at Exs. (SUPP D)-9 and (SUPP D)-10, tabs "D,III,B4-5 Summary," Appx06139-06142, Appx06348-06352; Second Suppl. Section D Response at Ex. (2nd Supp D)-9, tab "D,III,B4-5 Summary," Appx07721-07724. Commerce determined that CPW's cost database may have included costs associated with the production of large diameter welded

40

pipe outside of the POR because CPW's reconciliation included the first three months of 2019 that fell outside of the POR. See Final I&D Mem. at 15, Appx09007. Second, Commerce found that CPW did not submit its reconciliation in the form and manner requested because it did not establish a clear record on how the "double counted" costs in CPW's accounting system were excluded from CPW's reported cost database and reflected in CPW's cost reconciliation worksheets. See Final I&D Mem. at 13, Appx09005. Commerce's determinations on both points were unsupported by substantial evidence for the reasons set forth below.

> **i. CPW Complied with Commerce's Instructions by Providing Reasonable Explanations for Submitting Two Reconciliations**

Commerce's conclusion that CPW did not submit its cost reconciliation in the form and manner requested conflicts with the record showing that CPW generally followed Commerce's standard cost reconciliation template and provided a reasonable explanation for submitting two reconciliations. Commerce, however, determined that CPW did not submit its cost reconciliation in the form and manner requested because CPW allegedly failed to follow Commerce's request to "reconcile the fiscal year 2019 COGS to the POR COM, which would entail beginning with the 2019 fiscal year COM and removing the COM for the first 3 months of 2019 and adding the COM of the first 4 months of 2020." Final I&D Mem. at 12, Appx09004; see also First Section D Suppl. Questionnaire at 5-6, Appx03933-03934 (showing

Commerce's instructions and its sample template).  The CIT erroneously concurred, noting that CPW admitted that its cost reconciliations "were not submitted in the form and manner Commerce requested."    CPW, 633 F. Supp. 3d at 1324, Appx00009.

The instructions in Commerce's questionnaire provided that the format of a respondent's cost reconciliation may permissibly vary depending on the particular accounting practices of a respondent.  Specifically, Commerce's template chart stated that "{t}he items and order of the reconciliation will vary by situation." First Section D Supp. Questionnaire at 6, Appx03934.  Further, Commerce also recognized that "the format of reconciliation of submitted costs to the audited financial statement costs depends greatly on the nature of the accounting records maintained by the respondent." Final I&D Mem. at 11, Appx09003.  In other words, although Commerce initially instructed CPW to submit a COM covering the total POR in its cost reconciliation, Commerce nonetheless recognized that a respondent's reporting may differ depending on the situation.  CPW submitted its cost reconciliation for 2019 and 2020 in two exhibits so that it could "reconcile the POR1 {total}COM" with its financial statements that cover fiscal year 2019.  See First Suppl. Section D Response Part 2 at (Supp D)-2, Appx05959; id. at Exs. (SUPP D)-9 and (SUPP D)-10, Appx06139-06142, Appx06348-06352.  CPW's cost reconciliation otherwise followed Commerce's cost reconciliation template:

42

beginning with CPW's COGS per the audited financial statement (or unaudited financial statement in the case of 2020) and ending with CPW's reported COM for April 2019 – December 2019 and 2020.  Compare First Section D Suppl. Questionnaire at 5, Appx03933, with First Suppl. Section D Response Part 2 at Exs. (SUPP D)-9 and (SUPP D)-10, tabs "D,III,B4-5 Summary," Appx06139-06142, Appx06348-06352 and Second Suppl. Section D Response at Ex. (2ⁿᵈ Supp D)-9, tab "D,III,B4-5 Summary," Appx07721-07724; see also CPW 56.2 Br. at Ex. 2, Appx09166-09173 (demonstrating how CPW's cost reconciliation followed Commerce's verification methodology followed in the initial investigation). Commerce unreasonably concluded that CPW failed to submit its reconciliation in the form and manner requested by Commerce given that Commerce itself acknowledged that its requests for information will vary depending on the accounting systems of the respondent.

In the Second Supplemental Section D Questionnaire Commerce implicitly recognized the validity of CPW's approach by asking CPW to explain why it was necessary to separate reconciliations for the two fiscal periods.  See Second Section D Suppl. Questionnaire at 3, Appx06495 (asking CPW to explain why it could not generate "single COM report from its system").  Further, Commerce asked CPW to clarify why it "was necessary to include the costs for the first 3 months of 2019 in your reported costs" and explain "how the reconciliation accounts for the cost of

{merchandise under consider} produced before the POR." Id. at 4, Appx06496. Contrary to the CIT's conclusion that CPW admitted that its reconciliation was not consistent with Commerce's instructions, see CPW, 633 F. Supp. 3d at 1326, Appx00009, the record indicates that Commerce amended its initial request for a single comprehensive reconciliation covering the entire period when it instructed CPW to instead explain the reasons for its methodology. See Second Section D Suppl. Questionnaire at 4, Appx06496 (asking detailed questions concerning CPW's submitted reconciliation). No "reasonable mind might accept as adequate" Commerce's explanation for its determination that CPW failed to submit its cost reconciliation in the form and manner requested given that Commerce recognized that a respondent's reporting may deviate from this template and then invited CPW to explain the reasons for providing separate reconciliations for each fiscal period. Huaiyin, 322 F.3d at 1374.

In response to Commerce's request, CPW explained that it could not submit a single reconciliation covering the entire POR because its financial statements are audited and published on the calendar year, and because its "{accounting} system is not able to generate a cost report for a period that spans two years (i.e., April 2019-April 2020)." Second Suppl. Section D Response at (2nd Supp D)-13, Appx06997. CPW thus provided an explanation for the necessity of submitting separate reconciliations for each fiscal period because otherwise "{t}here would have been

no way for CPW to reconcile those costs to its audited financial statements." Id. at (2nd Supp D)-14, Appx06998.

CPW also explained why its cost reconciliation, despite covering fiscal year 2019, did not impermissibly include costs that fell outside of the POR. CPW advised Commerce that none of the products reported in its antidumping response were produced during the three months of 2019 that fell outside the POR. Id. at (2nd Supp D)-21, Appx07005. CPW submitted evidence showing that the products covered by all of the U.S. CONNUMS were produced entirely in [          time period

of sale          ]. See id. at (2nd Supp D)-8, Appx06992; see also CPW 56.2 Br. at 34 Ex. 3, Appx09145, Appx09174-09279 (demonstrating that none of the CONNUMs in CPW's cost database was produced in the first three months of 2019). In essence, CPW just removed the cost of products other than the subject large diameter welded pipe in a later stage of the reconciliation than in Commerce's standard template. Once CPW had filtered out only costs associated with the production of large diameter welded pipe, there would be no need to do any further adjustments from the first three months of 2019 because there was no large diameter welded pipe production in that period. Commerce determination that CPW did not submit its reconciliation in the requested form and manner cannot withstand scrutiny when Commerce appears to be objecting to the order in which adjustments are made

to come to the cost data submitted by CPW. Such a conclusion wrongly elevates the timing of the adjustments over the substance.

Finally, no reasonable reading of the record supported Commerce's finding, as emphasized by the CIT in sustaining Commerce's determination, that CPW did not "'notify Commerce that it was unable to submit {its cost} information in the form and manner requested in Commerce's supplemental questionnaires.'" CPW, 633 F. Supp. 3d at 1324, Appx00009 (quoting Final I&D Mem. at 4, Appx08996). CPW had no reason to make such a notification because its cost reconciliation followed the methodology employed by Commerce in the initial investigation wherein Commerce verified CPW's costs as reconciled to the fiscal year. See Rebuttal Factual Information at Ex. 1, Appx08904-08935 (discussing how the period of investigation corresponds with CPW's fiscal year and how Commerce reconciled CPW's reported cost data to CPW's financial accounting system, i.e., CPW's trial balance and financial statements, for the entire year). Moreover, Commerce used CPW's submitted data in its Preliminary Results. See Prelim. Results, 86 Fed. Reg. at 43,172, Appx08527. CPW had no reason to know that Commerce did not accept its explanation for submitting separate reconciliations for each fiscal period when Commerce relied on CPW's submitted data in the Preliminary Results and Commerce provided no other indication of its finding that CPW's costs did not

46

reconcile after CPW submitted its response to Commerce's Second Supplemental Section Questionnaire.

### ii. CPW Provided Sufficient Information for Commerce To Determine That CPW's Costs Reconciled

Commerce's conclusion that CPW failed to submit a clear record establishing that its costs did not reconcile, as sustained by the CIT, was unsupported by substantial evidence and otherwise not in accordance with law. See Final I&D Mem. at 13, Appx09005; see also CPW, 633 F. Supp. 3d at 1326, Appx00010. Commerce's determination to apply facts otherwise available was not in accordance with law because Commerce failed to meet its mandate under 19 U.S.C. § 1677e(a)(2), which is subject to the conditions of 19 U.S.C. § 1677m(d), to provide CPW with notice and opportunity to remedy the alleged deficiency that CPW's total COM calculated in its cost reconciliation included "double counted" costs and, once these costs were removed, CPW's submitted cost database did not reconcile with its financial accounting system.

The statute provides that Commerce's authority to rely on facts otherwise available is subject to 19 U.S.C. § 1677m(d), which requires that Commerce inform a respondent of "the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle." 19 U.S.C. § 1677m(d); id. § 1677e(a)(2). Here, Commerce never

informed CPW of the specific reason – the erroneous double deduction of semi-finished pipe costs – underlying Commerce's determination that CPW's costs did not reconcile.  Rather, in Commerce's First Supplemental Questionnaire, Commerce merely stated that CPW's cost reconciliation "does {not} tie to the cost reported in the cost database."   First Section D Suppl. Questionnaire at 5, Appx03933.  Commerce then requested that CPW "identify and quantify" certain reconciling items, explain how each reconciliation item in the reconciliation worksheet was determined, and then "reconcile the beginning and ending inventory finished goods inventory to your audited financial statements, trial balance, and finished goods inventory ledger." Id. at 5-6, Appx03933-03934.  Commerce, however, did not once refer to CPW's alleged "double counted" costs in its First Section D Supplemental Questionnaire.  See id. at 3-10, Appx03931-03938.

In its Second Section D Supplemental Questionnaire, Commerce informed CPW that it found CPW's reconciliation difficult to interpret but Commerce never explained why it found that CPW's costs did not reconcile.  See Second Section D Suppl. Questionnaire at 4, Appx06496.   Commerce asked detailed questions concerning CPW's cost reconciliation, including asking for CPW to explain particular fields in its reconciliation worksheets.  See id.  Despite asking detailed questions concerning CPW's submitted reconciliation, Commerce did not once indicate that it had concluded that CPW's reconciliation contained "double counted"

costs that needed to be twice removed.  In fact, the only reference in Commerce's Second Supplemental Questionnaire to CPW's "double counted" costs was Commerce's request for CPW to explain its response in First Supplemental Questionnaire on why it could not "generate a single COM report from its system being doing so would double or triple count costs when the product passes through multiple production phases" and explain "why costs would be double or triple counted."  Id. at 3, Appx06495.  Commerce never once explained to CPW why it determined it was necessary to go beyond CPW's submitted reconciliation to make further adjustments to remove "double counted" costs.

Commerce did not meet its obligation under 19 U.S.C. § 1677m(d) to provide CPW with notice of the alleged deficiency that CPW's reported costs included "double counted" costs and once these costs were subtracted, CPW's cost database did not reconcile with its financial accounting system.  "Commerce must publish its preliminary results, it must take an initial public position on the disputed issues in the {review}, and if necessary modify its position."  SKF USA Inc. v. United States, 391 F. Supp. 2d 1327, 1336 (Ct. Int'l Trade 2005) ("SKF CIT").  Indeed, "the statutory entitlement to notice and an opportunity to remedy any deficiency is unqualified."  Hitachi Energy USA Inc. v. United States, 34 F.4th 1375, 1384 (Fed. Cir. 2022) (holding that Commerce's determination was unsupported by substantial evidence where Commerce refused to allow a respondent to correct certain

deficiencies in its responses); see also Shelter Forest Int'l Acquisition, Inc. v. United States, 2022 U.S. App. LEXIS 16491, *13 (Fed. Cir. 2022) (holding that Commerce abused its discretion by failing to notify a respondent of a deficiency in its response).

The facts in the administrative proceeding at issue here are similar to those presented in SKF where Commerce applied AFA against a respondent because the respondent was unable to provide necessary documentation during verification. See SKF CIT, 391 F. Supp. 2d at 1328-29 (representing highly persuasive authority given the similarities to this action). There, the CIT ultimately remanded "Commerce's announcement of its decision to use partial AFA for the first time in the Final Results, and to offer no opportunity for SKF to respond, correct or clarify while SKF had not cooperated to the best of its ability." Id. at 1336. Commerce also faulted the respondent in the administrative proceeding underlying SKF for not creating a clear or "accurate record" by failing to provide certain documents at verification. Id. The CIT, however, held that "Commerce has its own obligation to ensure that SKF was fully aware of what information {Commerce} sought and the form in which it sought the data." Id.[9] Like the CIT found in SKF, CPW cannot be faulted for not having a

---

[9]  The cases that the CIT relied on to support its conclusion that the burden was on CPW to establish a clear record are distinguishable from this case. See CPW, 633 F. Supp. 3d at 1326, Appx00010 (citing Nan Ya II, 810 F.3d at 1337-38 and Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003)). In Nan Ya II, the Federal Circuit reviewed Commerce's remand redetermination following the CIT's judgment in Nan Ya I litigation discussed above. Although the Federal Circuit

crystal ball to see that Commerce would twice remove its "double counted" costs. Had Commerce made it clear that it found that CPW's cost database did not reconcile with its financial accounting system because it still contained "double counted costs," as it was obligated to do under 19 U.S.C. § 1677m(d), CPW could have clarified and corrected Commerce's mistaken assumptions.

In the underlying administrative review challenged here, consistent with 19 U.S.C. § 1677m(d), it would have been "practicable" for Commerce to provide CPW with "an opportunity to remedy or explain the deficiency in light the time limits established for the completion of the . . . review{}" as Commerce could have released a post-preliminary determination including its reconciliation table such that CPW could have commented on Commerce's error to twice remove its "double counted" costs.   Id.   "Part of Commerce's responsibility in making accurate

_____

ultimately upheld Commerce's determination to rely on data from the current review to calculate the AFA rate for a respondent, this was only after the CIT initially remanded Commerce's determination for all interested parties to comment on Commerce's change in methodology between the preliminary and final results. See Nan Ya II, 810 F.3d at 1339-40. Here, the facts are analogous to those underlying Nan Ya I as CPW has not had an opportunity to comment. Further, in Nippon Steel, the Federal Circuit found that Commerce properly applied an adverse inference because "Commerce asked {the respondent} for the data, and {the respondent} respondent that information was not necessary for the investigation." Nippon Steel, 337 F.3d at 1383. Commerce even asked for the information a second time and the respondent answered that "the information did not exist." Id. Here, as discussed above, Commerce never specifically explained to CPW why it found it necessary to deviate from CPW's reconciliation worksheets and twice remove CPW's "double counted" costs.

antidumping duty determinations is to ensure that the parties' have notice of Commerce's decisions and be permitted to comment on its methodology and analysis." SKF CIT, 391 F. Supp. 2d at 1336 (citing NEC Corp. v. United States,151 F.3d 1361, 1374 (Fed. Cir. 1998)).  Commerce itself has recognized that "{i}ssuing a Post-Preliminary Analysis and providing all parties with an opportunity to comment on that analysis embodies the principles of transparency and openness underlying the Act and administrative law in general." Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates, 78 Fed. Reg. 29,700 (Dep't of Commerce May 21, 2013), and accompanying I&D Mem. at 8.  Alternatively, Commerce could have issued another supplemental questionnaire providing CPW with its reconciliation calculation and asking CPW to explain the apparent difference between the reported costs and what Commerce had calculated as the costs recorded in CPW's financial accounting system.  Either approach would have satisfied Commerce's statutory obligation to notify CPW of the perceived deficiency in CPW's submitted reconciliation.

Commerce had over six months between issuing its Preliminary Results and Final Results to issue a post-preliminary determination or supplemental questionnaire.  See Prelim. Dec. Mem. at 1, Appx08180 (dated July 30, 2021) and

Final I&D Mem. at 1, Appx08993 (dated Feb. 2, 2022).[10]  Given this significant

period of time, it was more than practicable for Commerce to provide CPW with

notice of the problem and release its cost reconciliation table for comment.  Again,

Commerce placed other new factual information on the record following the briefing

deadline and provided interested parties with an opportunity to comment.  See New

Factual Information at 1, Appx08600.  Even in this case, therefore, Commerce

recognized the importance of placing new information on the record for comments

from interested parties prior to relying on that information in the Final Results.

Issuing a post-preliminary determination, or a supplemental questionnaire, would

have allowed CPW to clarify and correct the record.  Commerce's failure to meet its

obligations under 19 U.S.C. § 1677m(d) thereby rendered its reliance on facts

otherwise available not in accordance with law.

Commerce's determination that CPW failed to establish a clear record that its

costs reconciled was also not supported by substantial evidence.  As discussed above,

---

[10] The CIT held that it would not require Commerce to issue a post-preliminary determination because it was not required under 19 U.S.C. § 1677m(g).  See CPW, 633 F. Supp. 3d at 1322-23, Appx00007-00008.  What is required, as the CIT acknowledges, is that Commerce support its decision to change its methodology between the preliminary and final results.  See id.  This necessitates that Commerce provide CPW with an opportunity to comment on Commerce's finding that CPW's costs did not reconcile. While the means that Commerce takes to support its determination with substantial evidence is discretionary, such as issuing a post-preliminary determination or a supplemental questionnaire, meeting this burden is a mandatory obligation placed on Commerce.

Commerce itself was able to replicate CPW's reconciliation but for its mistaken assumption to twice remove CPW's "double counted" costs. Compare Final Calc. Mem. at Attachs. 1-2, Appx09019-09020 (showing Commerce's reconciliation), with CPW 56.2 Br. at Ex. 1, Appx09157-09165 (replicating Commerce's reconciliation tables to demonstrate that CPW's costs reconciled but for Commerce's determination to twice remove CPW's costs associated production of semi-finished pipe (highlighted in yellow)). CPW provided a detailed explanation for how its reconciliation worksheets accounted for its "double counted" costs. CPW explained that its "cost build up worksheets, prepared in the normal course of business and submitted to Commerce, present the accumulation of costs at each stage of production – bare pipe production, coating, and ling – for each material code." Second Suppl. Section D Response at (2nd Supp D)-2, Appx06986. CPW demonstrated that its cost reconciliation worksheets included an SAP Rollup that accounted for these double counted costs, including an explanation and screenshot explaining the process for CPW's cost tree in its SAP Rollup. See id. at (2nd Supp D)-3, Appx06987. Importantly, CPW explained that Commerce had previously verified its SAP Rollup process in the initial investigation and found that it could tie the SAP Rollup report to "the total costs, offsets, and production quantity shown in the SAP report to the cost calculation worksheet." Id.; see also Rebuttal Factual Information at Ex. 1, Appx08904-08935. The data submitted by CPW were

otherwise sufficient for Commerce to calculate a dumping margin of zero percent for CPW in the Preliminary Results.  See Prelim. Results, 86 Fed. Reg. at 43,172, Appx08527.  There is no reasonable reading of the record that supports Commerce's finding that CPW failed to establish a clear record especially in light of the fact that Commerce itself was able to replicate CPW's reconciliation but for one mistake that was not consistent with the detailed explanations provided by CPW.

## B. Commerce's Determination to Rely on an Adverse Inference Was Unsupported by Substantial Evidence

Even if this Court holds that Commerce's application of facts otherwise available was supported by substantial evidence and otherwise in accordance law, Commerce's application of total AFA against CPW was nonetheless unsupported by substantial evidence because CPW cooperated to the best of its ability by submitting a full cost reconciliation.  At most, Commerce could have applied facts otherwise available against CPW for (in Commerce's view) deviating slightly from its standard reconciliation template by providing separate reconciliations for each fiscal period.  CPW's alleged limited departure from what was requested cannot lawfully support the application of an adverse inference against CPW when all Commerce needed to do was add CPW's two reconciliations together to get a COM covering the entire POR.  The record otherwise contained ample information for Commerce, as it did in the Preliminary Results, to calculate a dumping margin for CPW.

Commerce applied total AFA against CPW because it found that it failed to submit a complete cost reconciliation as "there was a large unreconciled difference between {CPW's} audited financial statements and its reported costs" and CPW was not allegedly responsive to Commerce multiple requests for information. See Final I&D Mem. at 6-7, 15, Appx08998-08999, Appx09007. But "{t}he focus of {19 U.S.C. § 1677e(b)} is respondent's failure to cooperate to the best of its ability, not its failure to provide requested information." Nippon Steel, 337 F.3d at 1382 (emphasis added). "{B}ecause Commerce is empowered to use adverse inferences only in 'selecting from among the facts otherwise available,' it may not do so in disregard of information of record that is not missing or otherwise deficient." Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (quoting Gerber Food (Yunnan) Co. v. United States, 387 F. Supp. 2d 1270, 1288 (Ct. Int'l Trade 2005)); see also Hyundai Elec. & Energy Sys. v. United States, No. 2021-2312, 2022 U.S. App. LEXIS 22235, at *10-11 (Fed. Cir. Aug. 11, 2022) (affirming the CIT's finding that a respondent "complied with Commerce's requests to the best of its ability, and that any mistakes were inadvertent and were corrected without undue difficulty"). In short, Commerce cannot lawfully impose total AFA against a respondent based solely on its failure to provide the requested information where the respondent otherwise cooperated to the best of its ability and when there was other information on the record that could have been used to calculate the

dumping margin or otherwise confirm the reliability of the data. Here, there was information on the record, neutral facts available, that could have been used to calculate CPW's dumping margin short of the unreasonable application of total AFA. Commerce used this information to calculate a zero percent dumping margin for CPW in the Preliminary Results and should have continued to apply this methodology in the Final Results.

The facts here are similar to those in the proceedings underlying Zhejiang DunAn and Hyundai Electric where the Federal Circuit held that Commerce cannot apply total AFA when the gaps on the respective record in each case were small and could otherwise be filled with other information on the record. See Zhejiang DunAn, 652 F.3d at 1348; Hyundai Elec., 2022 U.S. App. LEXIS 22235, at *10-11. In the proceeding underlying Zhejiang DunAn, Commerce applied partial AFA to calculate a dumping margin where the respondent did not provide sales quantities for the subject merchandise for one month. See Zhejiang DunAn, 652 F.3d at 1348. The Court held that Commerce's application of AFA was not warranted under 19 U.S.C. § 1677e(a), however, because Commerce could have calculated the dumping margin using other record evidence without the missing information. See id. Similarly, the Court held in Hyundai Electric that Commerce erred in applying AFA and rejecting a respondent's entire home market sales database where record evidence demonstrated that most of the respondent's price information was reliable. See

Hyundai Elec., 2022 U.S. App. LEXIS 22235, at *10.   The Court reasoned that Commerce erred in applying adverse inferences "in light of the record, which demonstrated that most of Hyundai's price information was reliable."   Id.   On remand in the course of the Hyundai Electric litigation, Commerce applied partial neutral facts available and calculated a zero percent dumping margin for the respondent.   See Hyundai Heavy Indus. Co., Ltd. v. United States, 527 F. Supp. 3d 1374, 1376-77 (Ct. Int'l Trade 2021) (sustaining remand).   Like the small gaps on the record in the proceedings underlying Zhejiang DunAn and Hyundai Electric, at most CPW did not submit a single reconciliation covering the entire POR as initially requested by Commerce. Such a minor "gap" cannot justify an application of total AFA where CPW otherwise cooperated to the best of its ability.   CPW reasonably explained why it could not submit a reconciliation covering the entire POR (as opposed to two COMs that could be added together to cover the full POR) and demonstrated why its costs reconciled once Commerce's mistaken assumption is corrected.  Given that the record contained sufficient information to fill the alleged gap in the record such that Commerce could not reasonably conclude that CPW did not cooperate to the best of its ability, Commerce's application of total AFA was unsupported by substantial evidence.

## CONCLUSION AND RELIEF SOUGHT

Commerce's determination to apply total AFA against CPW was unsupported by substantial evidence and otherwise not in accordance with law because Commerce failed to meet its statutory obligation to provide CPW with an opportunity to comment on Commerce's change in methodology in the Final Results and no reasonable reading of the record can support Commerce's findings that CPW withheld information or impeded Commerce's investigation, did not submit information in the form or manner requested or did cooperate to the best of its ability. For the foregoing reasons, this Court should reverse the judgment of the CIT sustaining Commerce's application of total AFA against CPW. This Court should remand the case with instructions that Commerce find that CPW's costs reconciled and use CPW's data to calculate a dumping margin of zero percent consistent with the Preliminary Results.

Respectfully submitted,

September 29, 2023

/s/ Kristin H. Mowry
Kristin H. Mowry
Jill A. Cramer
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
*Counsel to Corinth Pipeworks Pipe Industry S.A. and CPW America Co.*

# ADDENDUM

No *Shepard's* Signal™
As of: September 19, 2023 2:17 PM Z

# *Corinth Pipeworks Pipe Indus. SA v. United States*

United States Court of International Trade

April 28, 2023, Decided

Court No. 22-00063

**Reporter**
633 F. Supp. 3d 1314 *; 2023 Ct. Intl. Trade LEXIS 66 **; SLIP OP. 2023-65

CORINTH PIPEWORKS PIPE INDUSTRY SA and CPW AMERICA CO., Plaintiffs, v. UNITED STATES, Defendant, and THE AMERICAN LINE PIPE PRODUCERS ASSOCIATION TRADE COMMITTEE, Defendant-Intervenor.

**Disposition:** Commerce's Final Results sustained.

## Core Terms

reconciliation, costs, final result, questionnaire, reconcile, Calculation, margin, Plaintiffs', methodology, dumping, cooperate, supplemental, worksheets, parties, administrative review, substantial evidence, responses, audited financial statement, original investigation, sustains, percent, records, cost accounting system, double-counted, circumstances, merchandise, database, final determination, adverse inference, post-preliminary

## Case Summary

### Overview
HOLDINGS: [1]-Commerce properly determined that the use of facts otherwise available was warranted because plaintiff failed to submit "a complete and usable cost reconciliation" in the form and manner requested, thus withholding information necessary to demonstrate that all costs were either appropriately included or excluded; [2]-As for drawing an adverse inference in selecting from among the facts otherwise available, Commerce properly concluded that plaintiff failed to cooperate because, even after multiple requests, plaintiff did not submit a complete cost reconciliation, and it did not act to the best of its ability to comply with a request for information.

### Outcome
The result was sustained.

## LexisNexis® Headnotes

Administrative Law > Judicial Review > Standards of Review > Substantial Evidence

International Trade Law > ... > Exports & Imports > Countervailing Duties > Judicial Review

International Trade Law > ... > Antidumping > Trade Agreements Act > US Department of Commerce

International Trade Law > ... > Antidumping > Trade Agreements Act > Judicial Review

*HN1*[⬇] **Standards of Review, Substantial Evidence**

For administrative reviews of antidumping duty orders, the court sustains Commerce's determinations, findings, or conclusions unless they are unsupported by substantial evidence on the record, or otherwise not in accordance with law. *19 U.S.C.S. § 1516a(b)(1)(B)(i)*. More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Substantial evidence has been described as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence has also been described as something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Fundamentally, though, substantial evidence is best understood as a word formula connoting reasonableness review. Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged

agency action was reasonable given the circumstances presented by the whole record.

International Trade Law > ... > Antidumping > Trade Agreements Act > US Department of Commerce

## _HN2_[🔽]  Trade Agreements Act, US Department of Commerce

During the course of an administrative review, but before making a final determination, Commerce shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority or the Commission (as the case may be) upon which the parties have not previously had an opportunity to comment. _19 U.S.C.S. § 1677m(g)._

International Trade Law > ... > Antidumping > Trade Agreements Act > US Department of Commerce

## _HN3_[🔽]  Trade Agreements Act, US Department of Commerce

Each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.

Administrative Law > Judicial Review > Standards of Review > Substantial Evidence

International Trade Law > ... > Antidumping > Trade Agreements Act > US Department of Commerce

## _HN4_[🔽]  Standards of Review, Substantial Evidence

The court will not impose requirements on Commerce's administrative process that are not found in statutes, especially where it is well established that Commerce may change its stance on issues decided preliminarily in its final determinations, so long as it explains the reasoning for the change and its decision is supported by substantial evidence and in accordance with law.

Business & Corporate Compliance > ... > Exports & Imports > Countervailing Duties > US Department of Commerce

International Trade Law > ... > Antidumping > Trade Agreements Act > US Department of Commerce

## _HN5_[🔽]  Countervailing Duties, US Department of Commerce

Commerce may rely on facts otherwise available if, among other things, an interested party withholds information that Commerce has requested, fails to provide such information in the form and manner requested, or significantly impedes a proceeding. _19 U.S.C.S. § 1677e(a)._ Additionally, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. _§ 1677e(b)(1)._

Evidence > Burdens of Proof > Allocation

International Trade Law > ... > Antidumping > Trade Agreements Act > US Department of Commerce

## _HN6_[🔽]  Burdens of Proof, Allocation

The burden of creating an adequate record lies with interested parties and not with Commerce. Further, the mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination.

Administrative Law > Judicial Review > Reviewability > Reviewable Agency Action

## _HN7_[🔽]  Reviewability, Reviewable Agency Action

Where two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review.

Evidence > Inferences & Presumptions > Inferences

International Trade Law > ... > Antidumping > Trade Agreements Act > US Department of Commerce

633 F. Supp. 3d 1314, *1314; 2023 Ct. Intl. Trade LEXIS 66, **66

**HN8**[🔗]  **Inferences & Presumptions, Inferences**

To justify the use of adverse inferences, Commerce must show that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations, and that the particular respondent has failed to put forth its maximum efforts to investigate and obtain the requested information from its records. Intent is irrelevant when determining whether a respondent has cooperated to the best of its ability.

International Trade Law > ... > Antidumping > Trade Agreements Act > US Department of Commerce

**HN9**[🔗]  **Trade Agreements Act, US Department of Commerce**

Under *19 U.S.C.S. § 1677e(b)(2)*, Commerce is empowered to rely on various sources of information for adverse inferences, including the petition. When Commerce relies on information derived from the petition, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal. *§ 1677e(c)(1)*. Corroborate means that the Secretary will examine whether the secondary Information to be used has probative value. *19 C.F.R. § 351.308(d)*. The corroboration requirement captures Congress's intent for an AFA rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance. An AFA rate is punitive if it is not based on facts and has been discredited by the agency's own investigation.

**Counsel:** **[\*\*1]** Kristin H. Mowry and Bryan P. Cenko, Mowry & Grimson, PLLC of Washington, D.C., argued for Plaintiffs Corinth Pipeworks Pipe Industry S.A. and CPW America Co. With them on the briefs were Jeffrey S. Grimson and Jill A. Cramer.

Eric J. Singley, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C., argued for Defendant United States. With him on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, L. Misha Preheim, Assistant Director. Of counsel were Christopher Kimura, Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

Timothy C. Brightbill and Laura El-Sabaawi, Wiley Rein

LLP of Washington, D.C., argued for Defendant-Intervenor American Line Pipe Producers Association Trade Committee.

**Judges:** Before: Leo M. Gordon, Judge.

**Opinion by:** Leo M. Gordon

# Opinion

 **[\*1317]** Gordon, Judge: Plaintiffs Corinth Pipeworks Pipe Industry S.A. and CPW America Co. challenge the U.S. Department of Commerce's ("Commerce") final results of the first administrative review of the antidumping duty order covering large diameter welded pipe from Greece. See *Large Diameter Welded Pipe from Greece, 87 Fed. Reg. 7,120 (Dep't of Commerce Feb. 8, 2022)* ("Final Results **[\*\*2]** "), and the accompanying Issues and Decision Memorandum (Dep't of Commerce Feb. 2, 2022), PR[1] 96 ("Decision Memorandum"); see also *Large Diameter Welded Pipe from Greece, 84 Fed. Reg. 18,769 (Dep't of Commerce May 2, 2019)*.

Before the court is Plaintiffs' motion for judgment on the agency record under *USCIT Rule 56.2*. See Pls.' Am. Mot. for J. on the Agency R., ECF No. 48[2] ("Pls.' Br."); see also Def.'s Am. Resp. to Pls.' Mot. for J. on the Agency R., ECF No. 49; Def.-Intervenor Am. Line Pipe Producers Ass'n Trade Comm.'s Resp. Opp. Pls.' Mot. for J. on the Agency R., ECF No. 35; Pls.' Am. Reply in Supp. of Mot. for J. on the Agency R., ECF No. 50 ("Pls.' Reply"). The court has jurisdiction pursuant to *Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930*, as amended, *19 U.S.C. § 1516a(a)(2)(B)(iii) (2018)*,[3] and *28 U.S.C. § 1581(c) (2018)*. For the reasons set forth below, the court sustains Commerce's Final Results.

## I. Background

Plaintiff Corinth Pipeworks Pipe Industry S.A. ("Corinth")

---

[1] "PR" refers to a document contained in the public administrative record. See ECF No. 19-1.

[2] All citations to parties' briefs and the agency record are to their confidential versions unless otherwise noted.

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of *Title 19 of the U.S. Code*, 2018 edition.

Case: 23-2094    Document: 16    Page: 75    Filed: 09/29/2023

Page 4 of 13

633 F. Supp. 3d 1314, *1317; 2023 Ct. Intl. Trade LEXIS 66, **2

was the sole mandatory respondent, and indeed the sole producer and/or exporter of the subject merchandise, in the underlying administrative review.[4] *Final Results, 87 Fed. Reg. at 7,121*; *see also Large Diameter Welded Pipe from Greece, 86 Fed. Reg. 43,172 (Dep't of Commerce Aug. 6, 2021)* ("Preliminary Results"), and the accompanying Preliminary Decision Memorandum (Dep't of Commerce July 30, 2021), PR 73 (<u>"PDM"</u>). The period of review was April 19, 2019 through April 30, 2020. <u>PDM</u> at 1.

Commerce issued its initial antidumping questionnaire **[\*\*3]** to Corinth in July 2020, followed by two supplemental questionnaires in May and July 2021 respectively regarding Corinth's cost of production ("COP") and constructed value ("CV") data (Section D). <u>Id.</u> at 2. Corinth timely responded to both, but because its response to the second supplemental questionnaire came shortly before the issuance of the <u>Preliminary Results</u>, Commerce stated in the <u>PDM</u> that it would consider that response in the <u>Final Results. Id.</u> at 2.

In the initial questionnaire, Commerce directed Corinth to report per-unit COP and CV figures based on the company's "actual costs incurred . . . during the period of review ["POR"], as recorded under [its] normal accounting system." Dep't of Commerce Questionnaire (July 17, 2020) at D-2, PR 11. Commerce emphasized that "[t]he CONNUM[5] specific COP and CV **[\*1318]** figures [provided] . . . <u>must reconcile to the actual costs reported in your company's normal cost accounting system and to the accounting records used by your company to prepare its financial statements." Id.</u> at D-10. To accomplish this goal, Commerce provided a sample reconciliation for Corinth to follow, directing Corinth to take "a 'top-down' approach (*e.g.*, financial statements **[\*\*4]** to per-unit cost), starting with cost of sales from the financial statements and proceeding step-by-step down through cost of manufacturing [("COM")] for the reporting period to the summation of

---

[4] Plaintiff CPW America Co. is Corinth's U.S. subsidiary and the U.S. importer of large diameter welded pipe who participated in the underlying proceeding. <u>See Summons</u>, ECF No. 1.

[5] A "CONNUM" is a contraction of the term "control number," and is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding). All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as "identical" merchandise for purposes of the price comparison.

the reported per-unit costs." <u>Id.</u> at D-12.

Corinth responded timely to the initial questionnaire, but Commerce found that the company's response regarding Section D contained deficiencies. <u>See</u> Corinth's Initial Sec. D Questionnaire Resp. (Sept. 21, 2020), PR 34-35; <u>Decision Memorandum</u> at 12 (noting that Corinth's reconciliation was not submitted as "one complete reconciliation" as requested, but rather, "two separate reconciliations for different parts of the POR," and determining that the reconciliation provided "did not reconcile the expenses per the audited income statement to its extended cost database," "relied on amounts that included the counting of product costs at both the semifinished stage and the finished product stage, resulting in 'double counted' costs from intermediate stages," and "did not show the total extended POR COM from the COP database").

Accordingly, Commerce issued its first supplemental questionnaire, directing Corinth, <u>"[a]s requested, [to] provide worksheets in the **[\*\*5]** format shown below, reconciling the total POR COM to the total of the per-unit manufacturing costs submitted to Commerce"</u> and to "[i]dentify and quantify" various reconciling items. Dep't of Commerce Suppl. Sec. D Questionnaire (May 27, 2021) at 5, PR 55 (emphasis added); <u>see also Decision Memorandum</u> at 12-13. Corinth's first supplemental response again included two partial reconciliations instead of a single complete reconciliation, which still "failed to exclude the first quarter 2019 costs" and was also missing other reconciling items. <u>See</u> Corinth's First Suppl. Sec. D Questionnaire Resp. (June 22 & 25, 2021), PR 62-63; <u>Decision Memorandum</u> at 13.

Commerce then issued a second supplemental Section D questionnaire, warning Corinth that its "section D and the supplemental D responses lacked adequate descriptions of [its] response methodology." Dep't of Commerce Second Suppl. Sec. D Questionnaire ("Second Suppl. Quest.") (July 15, 2021) at 4, PR 65. Commerce further explained that "[the company's] extensive calculation worksheets and reconciliation are difficult to interpret because of the lack of adequate descriptions as to the methodology used in the normal records or in [its] reporting **[\*\*6]** to Commerce." <u>Id.</u> Commerce asked Corinth to explain, <u>inter alia</u>, why Corinth found it necessary to include reported costs for months outside the POR and why the company was "unable to generate a single COM report from its system." <u>Id.</u> at 3-4. Commerce also requested explanations for certain steps, lines of data, and

definitions contained in Corinth's submitted worksheets. Id. at 4.

In its second supplemental response, Corinth again insisted that it could not combine multiple years in its SAP (cost accounting system) reporting, and thus needed to submit separate reconciliations. Corinth's Second Suppl. Sec. D Questionnaire Resp. ("Corinth's Second Suppl. **[*1319]** Quest. Resp.") (July 22, 2021) at 13, PR 69; see also Decision Memorandum at 13. Further, Corinth confirmed that it could not "generate a single COM report from its system because doing so would double or triple count costs when the product passed through multiple phases." Corinth's Second Suppl. Quest. Resp. at 2; Decision Memorandum at 14. Corinth stated, however, that "[t]o demonstrate that Commerce has complete cost data for this review which reconciles to [Corinth's] audited financial statements, [Corinth] prepared and submitted **[**7]** an annotated version of its cost reconciliation exhibit for 2019," ostensibly showing "a 'road map' for the worksheets and source data contained in the exhibit." Corinth's Second Suppl. Quest. Resp. at 14 ("On each sheet of the annotated version of [the exhibit, Corinth] inserted a brief explanation of what information the sheet presents, the source of the data, and how the sheet relates to the overall reconciliation.").

In the Preliminary Results, Commerce conducted the less than fair value ("LTFV") analysis by comparing the constructed export price of Corinth's U.S. sales to normal value based on CV. PDM at 7, 14 ("[19 U.S.C. § 1677b(e)] provides that CV shall be based [in part] on the sum of the cost of materials and fabrication for the imported merchandise . . . ."). Based on that analysis, Commerce "preliminarily determine[d] that sales of the subject merchandise [had] not been made at prices less than normal value," and that Corinth's estimated weighted-average dumping margin was 0.00 percent. Id. at 1; Preliminary Results, 86 Fed. Reg. at 43,172.

After issuing the Preliminary Results and reviewing Corinth's questionnaire responses in their entirety, Commerce attempted "to piece together a meaningful reconciliation" itself "[u]sing the voluminous **[**8]** worksheets, datafiles, and report downloads submitted by Corinth." Decision Memorandum at 14; see Cost of Production and Constructed Value Calculation Adjustments for Final Results (Feb. 2, 2022), PR 97 ("Final Results Calculation Memorandum"). From its analysis, Commerce identified four flaws in Corinth's cost responses: (1) that Corinth "failed to provide a proper cutoff of accounting periods and one complete POR cost reconciliation worksheet"; (2) that, even after the removal of amounts designated for exclusion, the total TOTCOM (total cost of manufacturing) costs "still include[d] 'double counted' costs in the COP/CV file reported by [Corinth] per their SAP [cost accounting] system"; (3) that, once the double counted costs were removed, "the amounts contained in the COP/CV file include costs and quantities that are not in accordance with [Corinth's] GAAP compliant audited financial statements"; and (4) that "significant differences in materials and conversion costs" existed between the audited financial statements and the SAP system report. Final Results Calculation Memorandum at 2-4.

Consequently, Commerce concluded that Corinth's cost data was unusable because the company "failed **[**9]** to provide a proper reconciliation of the extended cost file amounts to [cost of goods sold] per their audited income statement." Decision Memorandum at 10. Commerce further determined that Corinth had "not cooperate[d] to the best of its ability in responding to Commerce's requests for information concerning its cost of producing the merchandise under consideration [("MUC")]." Id. Accordingly, Commerce applied "total" adverse facts available ("AFA") and selected, as Corinth's dumping margin, "the highest dumping margin alleged in the petition," 41.04 percent. Id. at 7.

Now before the court, Plaintiffs challenge the Final Results. Specifically, Plaintiffs **[*1320]** argue that Commerce unreasonably applied total AFA when determining Corinth's dumping margin because it did not permit an opportunity for comment by the parties on the use of AFA,[6] erroneously rejected Corinth's cost data, and ultimately selected a unreasonable rate. For the reasons that follow, the court sustains the Final Results.

## II. Standard of Review

HN1[↑] For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations,

---

[6] Following the Final Results, Corinth filed comments purporting to identify ministerial errors in Commerce's Final Results Calculation Memorandum. See Corinth's Ministerial Error Comments (Feb. 9, 2022), PR 101. Commerce determined that Corinth's challenge raised substantive issues that were methodological rather than ministerial and declined to consider Corinth's arguments. See Dep't of Commerce Ministerial Error Memorandum (Mar. 3, 2022), PR 110. Before the court, Plaintiffs do not challenge Commerce's decision to reject the comments as methodological.

633 F. Supp. 3d 1314, *1320; 2023 Ct. Intl. Trade LEXIS 66, **9

findings, or conclusions" unless they are "unsupported by substantial **[\*\*10]** evidence on the record, or otherwise not in accordance with law." *19 U.S.C. § 1516a(b)(1)(B)(i)*. More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006)*; see also *Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S. Ct. 456, 95 L. Ed. 456 (1951)* ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005)* (quoting *Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)*). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966)*.

Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2023). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National **[\*\*11]** Courts § 3.6 (5th ed. 2022).

## III. Discussion

### A. *19 U.S.C. § 1677m(g)*

*HN2* [ ] During the course of an administrative review, but before making a final determination, Commerce "shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority or the Commission (as the case may be) upon which the parties have not previously had an opportunity to comment." *19 U.S.C. § 1677m(g)*.

According to Plaintiffs, Commerce failed to satisfy the requirements of *§ 1677m(g)* because it did not give Corinth an opportunity to comment on its changed dumping margin methodology—i.e., its application of total AFA—in the Final Results. See Pls.' Br. 9 ("This provision requires Commerce to give parties an opportunity to comment on a post-preliminary change in methodology (e.g., a different method of calculating the respondent's dumping margin) prior to its final determination/results.").

Importantly, Plaintiffs do not claim that Corinth lacked an opportunity to comment on new information obtained by Commerce; rather, they object to Commerce's failure to allow comment on its interpretation of information already on the record. See, e.g., id. at 2 ("Because Commerce's calculations **[\*\*12]** and worksheets were not disclosed to [Corinth] prior to the Final Results, [the company] had no opportunity to correct Commerce's fundamental misunderstandings or otherwise comment on the analysis and conclusions underlying Commerce's AFA findings.").

Based on their reading of *§ 1677m(g)*, Plaintiffs contend that Commerce's decision to apply total AFA in the Final Results was unreasonable, and that the matter should therefore be remanded so that Commerce can consider Corinth's arguments in the first instance. Pls. Br. 2-4, 8-13 ("[B]y failing to provide [Corinth] with the chance to comment on the change in methodology in the Final Results, Commerce deprived [Corinth] of the ability to demonstrate that the cost data were complete."). To support their position, Plaintiffs cite decisions where the court either discussed Commerce's obligations under *§ 1677m(g)*, or ordered remand to allow the parties to comment on new information obtained by Commerce, changes in Commerce's methodology, or other issues that were not raised at the administrative level. See Pls. Br. 9-10 (collecting cases). In particular, Plaintiffs rely on Koyo Seiko Co. v. United States, wherein the court noted that Commerce acted in accordance **[\*\*13]** with *§ 1677m(g)* when it provided the parties with an opportunity for comment on its introduction of a new methodology—albeit in the 15th administrative review—to determine which home market sales should be compared to sales made in the United States. *31 CIT 1512, 1513, 1520, 516 F. Supp. 2d 1323, 1328, 1333-34, SLIP OP. 2007-128 (2007)*.

As a threshold matter, Plaintiffs misunderstand the requirements of *§ 1677m(g)*. While Plaintiffs assert that *§ 1677m(g)* "requires Commerce to give parties an opportunity to comment on a post-preliminary **[\*1321]**

change in methodology (e.g., a different method of calculating the respondent's dumping margin) prior to its final determination/results," the provision's mandate is confined to information obtained by Commerce on which the parties have not yet had an opportunity to comment. The court has previously explained this distinction, observing that "[w]hen Commerce calculates margins 'it generates information; it does not collect information.'" *Tri Union Frozen Prods., Inc. v. United States, 40 CIT __, __, 163 F. Supp. 3d 1255, 1289, SLIP OP. 2016-33 (2016)* (citation omitted) ("[T]he statute requires Commerce to provide an opportunity to comment only on information it collects or obtains externally, not findings that it makes or generates internally. . . . Commerce's interpretation of factual information does not lead to the conclusion that its final determination is subject to comment."). **[**14]** Here, Commerce's review of the information already on the record led it to conclude that Corinth's margin should be calculated based on total AFA. See Decision Memorandum at 15 ("Although we relied on Corinth's cost data in the Preliminary Results, after further evaluating the information on the record of this proceeding and in light of parties' submissions, . . . . [w]e conclude that the necessary information for Corinth is not available on the record and that Corinth failed to provide such information in the form or manner requested and, thus, significantly impeded the proceeding.").

Likewise, Plaintiffs' reliance on what they view as the applicable caselaw is misplaced. The decisions cited by Plaintiffs **[*1322]** either involve distinguishable circumstances warranting compliance with *§ 1677m(g)*, or do not invoke *§ 1677m(g)* at all. See *Home Prods. Int'l, Inc. v. United States, 32 CIT 337, 339, 556 F. Supp. 2d 1338, 1340, SLIP OP. 2008-39 (2008)* (granting Commerce's voluntary remand request where interested parties had not had opportunity to comment on new information on record); Bristol Metals, L.P. v. United States, Court No. 09-00127, Order Dated Oct. 23, 2009, ECF No. 39 (granting Commerce's voluntary remand request without discussing *§ 1677m(g)*); *Nan Ya Plastics Corp. v. United States, 37 CIT 188, 194, 905 F. Supp. 2d 1348, 1354, SLIP OP. 2013-18 (2013)* (remanding because court could not sustain Commerce's determination based only on counsel's post hoc rationalizations); *CC Metals & Alloys, LLC v. United States, 40 CIT __, __, 145 F. Supp. 3d 1299, 1308, SLIP OP. 2016-3 (2016)* (same); see also Pls.' Br. 9-10 (citing **[**15]** all the foregoing).

The case on which Plaintiffs primarily rely, *Koyo Seiko*, is likewise unavailing. See *31 CIT at 1520, 516 F. Supp.*

*2d at 1333-34*; Pls.' Br. 9. Koyo Seiko relied, as do Plaintiffs, on Shikoku Chemicals Corp. v. United States for the proposition that "[p]rinciples of fairness prevent Commerce from changing its methodology at this late stage [i.e., the final results]." *16 CIT 382, 388, 795 F. Supp. 417, 421, SLIP OP. 92-74 (1992)*; see *Koyo Seiko, 31 CIT at 1520, 516 F. Supp. 2d at 1333*; Pls.' Br. 9.

The Court of Appeals for the Federal Circuit has recognized, however, that Shikoku turned on a showing of detrimental reliance. *SKF USA, Inc. v. United States, 537 F.3d 1373, 1381 (Fed. Cir. 2008)*. Beyond citing to Koyo Seiko and Shikoku, Plaintiffs' argument based on detrimental reliance is lacking. See generally Pls.' Br. (not discussing detrimental reliance); Pls.' Reply 9 ("[Corinth] relied on the methodology verified and followed by Commerce in the initial investigation when reconciling its reported costs. . . . [Corinth] cannot be faulted for not clarifying a record that it believed was clear based on the methods that Commerce had previously accepted."). *HN3*[⬆️] Plaintiffs' argument ignores that "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Jiaxing Brother Fastener Co. v. United States, 822 F.3d 1289, 1299 (Fed. Cir. 2016)* (citation omitted). As the court has discussed, **[**16]** Commerce was entitled to generate calculations and conduct its analysis based on the information on the record before it. This remains true even if Commerce reached different conclusions than it did in the original investigation, or, as here, in the Preliminary Results. Further, Plaintiffs' assertion that Corinth reasonably believed that the record in this review was clear is undermined by the fact that Commerce indicated, by means of its supplemental questionnaires, that Corinth's cost responses needed clarification. See, e.g., Second Suppl. Quest. at 4 ("[Corinth's] extensive calculation worksheets and reconciliation are difficult to interpret because of the lack of adequate descriptions as to the methodology used in the normal records or in [its] reporting to Commerce."). Thus, Plaintiffs "cannot properly analogize [their] situation to that in Shikoku, where '[t]he record contain[ed] evidence that plaintiffs adjusted their prices in accordance with methodology consistently applied by Commerce in an attempt to comply with United States antidumping law.'" *SKF USA, 537 F.3d at 1381* (quoting *Shikoku, 16 CIT at 386, 795 F. Supp. at 420*).

In sum, Plaintiffs attempt to broaden the reach of *§ 1677m(g)* to obligations that the statute was not

intended to create.[7] Relatedly, [**17] Plaintiffs have failed to [*1323] point to any statutory requirement outside of § 1677m(g) requiring Commerce to issue a "post-preliminary" decision other than the final results. Pls.' Br. 11-13 ("Commerce could have resolved any concerns surrounding the reconciliation of [Corinth's] reported data by issuing a post-preliminary decision, which Commerce often does when important issues remain undecided in its preliminary decision."). HN4[⬆️] The court will not impose requirements on Commerce's administrative process that are not found in the statute, especially where it is well established that "Commerce may change its stance on issues decided preliminarily in its final determinations, so long as it explains the reasoning for the change and 'its decision is supported by substantial evidence and in accordance with law.'" *Gov't of Argentina v. United States, 45 CIT   ,   , 542 F. Supp. 3d 1380, 1391 (2021)* (quoting *Hyundai Steel Co. v. United States, 42 CIT   ,   , 319 F. Supp. 3d 1327, 1343, SLIP OP. 2018-80 (2018)*); see also, e.g., *JBF RAK LLC v. United States, 38 Ct. Int'l Trade 1006, 1014, 991 F. Supp. 2d 1343, 1352, SLIP OP. 2014-78 (2014)* (holding, in context of post-preliminary determinations, that "Commerce enjoys considerable discretion in the conduct of its administrative proceedings").

Accordingly, the court rejects Plaintiffs' argument that Commerce unreasonably changed its methodology in the Final Results and turns to the issue of whether Commerce's decision to rely on total [**18] AFA in the Final Results was reasonable.

**B. Application of Total AFA**

HN5[⬆️] ] Commerce may rely on "facts otherwise available" if, among other things, an interested party "withholds information" that Commerce has requested, fails "to provide such information . . . in the form and manner requested," or "significantly impedes a proceeding." 19 U.S.C. § 1677e(a). Additionally, if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." Id. § 1677e(b)(1).

Here, Commerce determined that the use of facts otherwise available was warranted because Corinth failed to submit "a complete and usable cost reconciliation" in the form and manner requested, thus withholding "information necessary to demonstrate that all costs were either appropriately included or excluded from the reported cost database." Decision Memorandum at 4. For Commerce, "[b]y failing to correct deficiencies in its cost reconciliation, Corinth . . . significantly impeded the proceeding because reconciling items were unidentified and unsupported by [**19] the record." Id.

As for drawing an adverse inference in selecting from among the facts otherwise available, Commerce concluded that Corinth failed to cooperate because, "even after multiple requests, Corinth did not submit a complete cost reconciliation." Id. at 6. Corinth's failure to follow Commerce's requested reconciliation format, combined with the fact that the company "did not, for example, alert Commerce that it would have any difficulty" reconciling "its audited financial statement cost of [*1324] manufacturing . . . to the reported cost database," led Commerce to find that "Corinth did not act to the best of its ability to comply with a request for information." Id.

Finally, Commerce used total rather than partial AFA because the absence of a complete and useable cost reconciliation rendered "the information that Corinth provided . . . too incomplete to serve as a reliable basis for reaching a determination," and cited the court's recognition that "cost information is a vital part of [Commerce's] dumping analysis." Id. at 5 (citing *Mukand, Ltd. v. United States, 37 CIT 443, 454, SLIP OP. 2013-41 (2013)* (not reported in Fed. Supp.)) ("Additionally, Commerce has previously found that failure to provide a cost reconciliation warrants use of total AFA."). [**20] Commerce explained that, "[w]ithout the ability to reasonably establish that all costs were properly included or excluded, the entire cost response is called into question and leaves Commerce without the ability to use the per-unit costs in the cost database, as no adjustment to remedy the deficiency can be reasonably identified." Decision Memorandum at 5.

---

[7] Indeed, Plaintiffs' argument urging the court to remand this matter "so that the Court does not have to do the agency's work in attempting to discern how Commerce may respond to the deficiencies raised by [Corinth] that must be raised for the first time here" might have been better made under § 1677m(d). Section 1677m(d) requires Commerce to "promptly inform" a person who has made a deficient submission "of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity remedy or explain the deficiency." Commerce proactively explained how its determination complied with that subsection. Decision Memorandum at 4.

**1. Facts Available**

As an initial matter, Plaintiffs concede that Corinth's Section D responses—specifically, its cost reconciliation—were not submitted in the form and manner Commerce requested. Plaintiffs admit that Corinth submitted data for months outside the POR, and added a step to Commerce's reconciliation structure by adjusting for double-counted costs contained in its cost accounting system's data. Pls.' Br. 18 ("[Corinth] did not isolate those costs associated with the months prior to the POR as a separate step because [it] did not produce MUC in those three months. . . . The only other step in which [Corinth] provided an alternate to Commerce's preferred reconciliation structure was the last step where [Corinth] added the cost of consumption to the total costs reported in the financial accounting and then deducted the cost **[**21]** of production for merchandise not under consideration." (emphasis added)). While acknowledging these deviations from Commerce's instructions, Plaintiffs argue that Commerce should have accepted Corinth's data because it was "usable." Id.

Despite its belief that these changes were necessary to properly reconcile its costs, Corinth did not "notify Commerce that it was unable to submit [its cost] information in the form and manner requested in Commerce's supplemental questionnaires." Decision Memorandum at 4. Rather, according to Commerce, Corinth preferred "to provide a voluminous dump of different reports, worksheets, and tables." Id. Plaintiffs now contend that Corinth's cost reconciliation—deviations included—was "submitted . . . in the 'form and manner' requested by Commerce." Pls.' Br. 17. For Commerce, however, while Corinth's "data files (with tens of thousands of lines of data) and worksheets (showing significant amounts of costs repeatedly being swapped in and out of calculations) . . . [were] voluminous and complex," they were not "responsive to Commerce's specific requests," nor did "the files provide a clear reconciliation of the reported data." Decision Memorandum at 11 ("Merely **[**22]** providing a bulk of information does not constitute a response to inquiries requesting that a party clearly explain how its submitted cost data reconcile to their audited financial statement COM.").

When discussing Corinth's failure to respond in the "form and manner requested," Commerce explained its rationale for requesting a reliable reconciliation of respondents' cost data:

Commerce must . . . ensure that the aggregate amount of the reported costs **[*1325]** (i.e., summation of the unit costs extended by the corresponding production quantities) captures all costs incurred by the respondent in producing the MUC during the period under consideration. A major point of the reconciliation is to establish that the reported unit costs and production quantities square with the financial accounting system, the cost accounting system, and the production records, as required by the statute.

Id.

Commerce noted that it could not reconstruct Corinth's submitted reconciliation, finding: (1) double-counted costs, (2) mismatches between cost categories that it believed should reconcile, and (3) inclusion of months of data outside the POR. Specifically,

Commerce undertook a long and exhaustive analysis of [Corinth's] **[**23]** cost reconciliation exhibits. We analyzed the cost reconciliations given by [Corinth] to determine whether Commerce could reasonably rely on [Corinth's] cost information on the record. . . . Our analysis started with [Corinth's] 2019 audited financial statement COM amount and then grossed the amount up by adding the "double counting" reconciliation line items to reconcile to the total costs per SAP System (i.e., 2019 SAP cost report). Then we removed each identifiable overstated cost in order to get to a total reported costs figure. Our analysis not only demonstrates that the total COM provided by [Corinth] does not reconcile to the cost of reportable merchandise under consideration (MUC) but brings to light certain other issues that might have been addressed if [Corinth] had been responsive to our multiple requests for a proper reconciliation.

Final Results Calculation Memorandum at 2.

Plaintiffs devote a significant portion of their briefing and their argument to challenging the findings Commerce reached in its Final Results Calculation Memorandum and identifying the errors Commerce made in reconstructing Corinth's cost reconciliation. See Pls.' Br. 18-36; Oral Argument at 01:00-25:20, **[**24]** ECF No. 51 (Apr. 19, 2023). According to Plaintiffs, Commerce mistakenly identified costs as "double-counted" when all double-counted costs were already removed; Commerce believed at key points of its analysis that it was comparing data from Corinth's cost and financial accounting systems, when it was in fact relying only on

Case: 23-2094    Document: 16    Page: 81    Filed: 09/29/2023

Page 10 of 13

633 F. Supp. 3d 1314, *1325; 2023 Ct. Intl. Trade LEXIS 66, **24

data from the cost accounting system; Commerce also failed to recognize when it was comparing data derived from different product pools; and Commerce assumed Corinth's submission of cost accounting system reports from months outside of the POR meant that Corinth had submitted data regarding the MUC for months outside of the POR. Pls.' Br. 18-36.

In Plaintiffs' view, had Commerce complied with Corinth's instructions as to how to read its submissions, a full reconciliation of the company's costs would have been possible. Id. at 17 ("[Corinth] presented a detailed step-by-step summary of its cost reconciliation with screenshots and narrative explanations in its second supplemental section D questionnaire response."); see also id. at 22 ("In Exhibit 1, [Corinth] demonstrates step-by-step using Commerce's own reconciliation from the Calculation Memorandum that [the company's] [**25] reported costs do reconcile with its SAP cost system and that the final step undertaken by Commerce in its attempted cost reconciliation was incorrect and resulted in Commerce's erroneous determination that [Corinth's] costs did not reconcile."). Plaintiffs also contend that Corinth could have corrected any deficiencies if Commerce had provided adequate notice thereof: "To the extent that [Corinth's] explanation [of its cost data] needed further clarification, [*1326] [Corinth] could and would have resolved outstanding issues if it had notice that this explanation was not sufficient and not understood." Id. at 24.

Plaintiffs' focus on Commerce's alleged inability to understand and replicate Corinth's calculations is misplaced. _HN6_[⬆] "[T]he burden of creating an adequate record lies with interested parties and not with Commerce." _Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016)_ (quoting _QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011)_). Further, "[t]he mere failure of a respondent to furnish requested information—for any reason— requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." _Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003)_. Thus, Plaintiffs bear the burden of showing that Commerce acted unreasonably in rejecting Corinth's cost data.

Plaintiffs have failed to make [**26] such a demonstration. Their attempts to clarify the record by detailing Commerce's alleged errors only serve to support the finding that Corinth's submissions were inadequate. For example, Plaintiffs point to Commerce's allegedly erroneous "additional deduction from the fully

reconciled costs" intended to account for double-counting, while later acknowledging—as the court has noted—that Corinth deviated from Commerce's "preferred reconciliation structure" to "eliminate double-counted costs recorded in SAP" itself. Pls.' Br. 5, 18. Likewise, Plaintiffs claim that Corinth's failure "to exclude costs from the first quarter of 2019 that fell outside the POR" did not justify the application of total AFA, placing the onus on Commerce to interpret the over-inclusive data and conclude that "no production of MUC took place" during those months. See id. at 5, 29-31. These arguments, and Plaintiffs' additional descriptions of Corinth's preferred reconciliation methods, at best, provide an alternative means of analyzing the submitted data—an alternative that, by Plaintiffs' own admission, was not wholly consistent with Commerce's instructions. See id. at 18. That Plaintiffs may have identified [**27] "another possible reasonable choice" for the form and manner of its submissions falls short of the mark, especially where, as here, Plaintiffs' preferred means of reconciliation is confusing and requires Commerce to sift through unrequested and irrelevant information. See, e.g., _Uttam Galva Steels Ltd. v. United States, 44 CIT ___, ___, 476 F. Supp. 3d 1387, 1393, SLIP OP. 2020-151 (2020)_ (quoting _Tianjin Wanhua Co. v. United States, 40 CIT ___, ___, 179 F. Supp. 3d 1062, 1071, SLIP OP. 2016-28 (2016)_). _HN7_[⬆] "[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review." _Pokarna Engineered Stone Ltd. v. United States, 56 F.4th 1345, 1349 (Fed. Cir. 2023)_ (quoting _In re Jolley, 308 F.3d 1317, 1329 (Fed. Cir. 2002)_).

Therefore, based on its description of its own attempts to reconcile Corinth's information, and its explanation as to why a cost reconciliation was a necessary component underpinning its LTFV analysis as a whole, Commerce's decision to rely on facts available when determining Corinth's dumping margin was reasonable. See, e.g., _Macao Com. & Indus. Spring Mattress Mfr. v. United States, 44 CIT ___, ___, 437 F. Supp. 3d 1324, 1332, SLIP OP. 2020-37 (2020)_ (accepting cost reconciliation requirement where Commerce "fully described why the cost reconciliations it sought were vital for its . . . determinations and why [Commerce] could not accept Plaintiff's claimed inability to comply with Commerce's request for cost reconciliations").

[*1327] 2. Adverse Inferences

Case: 23-2094    Document: 16    Page: 82    Filed: 09/29/2023

Page 11 of 13

633 F. Supp. 3d 1314, *1327; 2023 Ct. Intl. Trade LEXIS 66, **27

*HN8*[↑] To justify the use of adverse inferences, **[**28] Commerce must show that "a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations," and that the particular respondent has failed "to put forth its maximum efforts to investigate and obtain the requested information from its records." *Nippon Steel, 337 F.3d at 1382-83* (citation omitted). Intent is irrelevant when determining whether a respondent has cooperated to the best of its ability. *Id. at 1383* ("The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent."); *see also, e.g., Ferrostaal Metals Gmbh v. United States, 45 CIT ___, ___, 518 F. Supp. 3d 1357, 1375-76, SLIP OP. 2021-54 (2021)* (rejecting plaintiffs' argument that "timely, but noncompliant" responses demonstrate cooperation).

In the Final Results, Commerce concluded that, despite "multiple chances"—i.e., supplemental questionnaires—"Corinth refused to provide the reconciliation in the format requested." Decision Memorandum at 7 ("In addition, based on our analysis of the record information, there is a large unreconciled difference between Corinth's audited financial statement COM and its reported costs."). As one example of Corinth's lack [**29] of cooperation, Commerce found that

> While Corinth may not have been able to generate a cost report for a period that spans two fiscal years, Corinth admits that it can extract a SAP costing report for a range of months in the same year. Thus, Corinth could have generated data for the last nine months of 2019 as it did for the first four months of 2020. . . . This exercise would have removed the costs incurred during the first three months of the POR.

Id. at 13-14 (emphasis added).

Corinth has failed to explain why it could not cooperate by generating cost reports for the ranges of months that Commerce requested. It is telling that, as proof of Corinth's cooperation, Plaintiffs point to the company's reliance on the approach it followed at the investigation stage, not on Commerce's instructions in the current review. See Pls.' Br. 38 ("[Corinth] followed the same general approach from the original investigation in responding to Commerce's cost questionnaires in the first administrative review. [Corinth's] cost responses were fully verified during an on-site verification in the

original investigation and [it] believed it was acting to the best of its ability by following the same approach [**30] from the original investigation." (emphasis added)); id. at 6 n.3 ("The original investigation cost verification report is on the record of this administrative review in [Corinth's] Rebuttal Factual Information Submission."). Plaintiffs' arguments again fail to recognize that Commerce is entitled to reach different findings during separate segments of its administrative proceedings. See, e.g., *Jiaxing, 822 F.3d at 1299*. Here, Commerce was not required to find that Corinth cooperated in the administrative review based on Commerce's findings about the company's information at the investigation stage.

Plaintiffs have failed to persuade the court that Commerce's decision to apply total AFA was unreasonable. In the Decision Memorandum, Commerce both explained the crucial nature of the information it deemed missing and incomplete—the cost reconciliation—and described Corinth's multiple instances of uncooperative behavior. Decision Memorandum at 6 ("Because Corinth failed to submit a complete cost reconciliation, we find that Corinth [*1328] did not provide Commerce with full and complete answers to Commerce's inquiries in this proceeding. Furthermore, because Corinth did not provide the reconciliation in the format requested [**31] and, thus, did not reconcile its audited financial statement cost of manufacturing . . . to the reported cost database, and Corinth did not, for example, alert Commerce that it would have any difficulty doing so, we find that Corinth did not act to the best of its ability to comply with a request for information."). It was "reasonable for Commerce to expect . . . more forthcoming responses," and to use total AFA when it did not receive such responses. *Nippon Steel, 337 F.3d at 1383*. The court therefore sustains Commerce's use of total AFA based on Corinth's failure to submit, in the form and manner requested, the information necessary to reconcile its costs.

## C. Dumping Margin

Plaintiffs lastly contend that, even if the court sustains Commerce's determination to apply AFA, the AFA rate selected by Commerce was unreasonable. Plaintiffs maintain that the 41.04 percent rate—the highest alleged in the Petition—was "excessive, punitive, and unjustified." Pls.' Br. 40 ("In selecting an AFA rate, Commerce must not 'impose punitive, aberrational, or uncorroborated margins' and an AFA rate should 'be a

reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to [**32] non-compliance.'" (quoting *BMW of N. Am. LLC, 926 F.3d 1291, 1297, 1300 (Fed. Cir. 2019)*)).

*HN9*[⬆] Under *19 U.S.C. § 1677e(b)(2)*, Commerce is empowered to rely on various sources of information for adverse inferences, including the petition. When Commerce relies on information derived from the petition, it "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." *Id. § 1677e(c)(1)*. "Corroborate means that the Secretary will examine whether the secondary Information to be used has probative value." *19 C.F.R. § 351.308(d) (2022)*. The corroboration requirement captures Congress's intent for an AFA rate "to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)*; see also *Hubscher Ribbon Corp. v. United States, 38 Ct. Int'l Trade 550, 552, 979 F. Supp. 2d 1360, 1366, SLIP OP. 2014-43 (2014)* ("[Corroboration is] a substantial evidence question in which the court reviews the reasonableness of Commerce's actions against a known legal standard given the facts and circumstances of the administrative record."). "An AFA rate is punitive if it is not 'based on facts' and 'has been discredited by the agency's own investigation.'" *Qingdao Taifa Grp. v. United States, 35 CIT 820, 826, 780 F. Supp. 2d 1342, 1349, SLIP OP. 2011-83 (2011)* (quoting *De Cecco, 216 F.3d at 1033*).

Plaintiffs' arguments here fail to demonstrate that the selected AFA rate was unreasonable. Relying only on broad assertions that the selected rate [**33] was "drastically overstated, punitive and unjustified," as well as on their prior arguments opposing Commerce's application of total AFA, Plaintiffs fail to persuasively explain how Commerce's selection of the 41.04 percent rate was unsupported by the record. See Pls.' Br. 41 (arguing that Corinth was cooperative respondent, and citing timeliness of Corinth's responses, its adherence to "same approach from the original investigation," and Commerce's purported failure to issue additional questionnaires between the Preliminary Results and the Final Results, as proof that "Commerce erred" by selecting petition rate). Without more, Plaintiffs have failed [*1329] to develop an argument as to what, if any, "mitigating circumstances" might call into question Commerce's choice of rate. See Pls.' Br. 41; cf. *BMW,*

*926 F.3d at 1302* (noting "unique factual circumstances surrounding BMW's failure to return the quantity-and-value questionnaire" that warranted further explanation by Commerce to justify a change in rate from 1.43 percent to 126.44 percent (emphasis added)).

Plaintiffs suggest that Commerce should have adopted an alternative rate, namely Corinth's dumping margin of 10.26 percent from the original investigation, [**34] which "required no secondary confirmation but instead was a calculated rate." Pls.' Br. 42. For Plaintiffs, this rate is "sufficiently adverse given that [Corinth's] dumping margin in this administrative review would have been 0.00 percent had Commerce used [Corinth's] actual reported data." *Id.* Corinth is not entitled, however, to a rate that it would have received if it had fully cooperated in the review. *19 U.S.C. § 1677b(d)(3)(A)*. Nor is Plaintiff entitled to a calculated rate that does not require secondary confirmation. See, e.g., *Hubscher Ribbon, 38 CIT at 558, 979 F. Supp. 2d at 1369* (acknowledging that use of petition rates is authorized by statute).

Further, contrary to Plaintiffs' assertion that Commerce failed to link the petition rate to Corinth itself, Commerce specifically found that the 41.04 percent rate was "within the range of transaction-specific margins calculated for Corinth in the investigation, and, thus, the 41.04 percent rate is both reliable and relevant." Decision Memorandum at 8. While Commerce's explanation relies on a single link between the rate and the respondent, this can come as no surprise where there is only one respondent—and where that respondent has been uncooperative. "Under such circumstances, Commerce's corroboration may [**35] be less than ideal because the uncooperative acts of the respondent [have] deprived Commerce of the very information that it needs to link an AFA rate to [respondent's] commercial reality." *Hubscher Ribbon, 38 CIT at 558, 979 F. Supp. 2d at 1369* (quoting *Qingdao Taifa, 35 CIT at 826, 780 F. Supp. 2d at 1349*). Accordingly, the court sustains as reasonable Commerce's selection of the petition rate as the AFA rate.

**IV. Conclusion**

For the foregoing reasons, the court concludes that Commerce reasonably applied total AFA in determining Corinth's antidumping duty margin in the Final Results. Therefore, the court sustains the Final Results. Judgment will enter accordingly.

633 F. Supp. 3d 1314, *1329; 2023 Ct. Intl. Trade LEXIS 66, **35

/s/ Leo M. Gordon

Judge Leo M. Gordon

Dated: April 28, 2023

New York, New York

_____

**End of Document**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CORINTH PIPEWORKS PIPE INDUSTRY SA and CPW AMERICA CO., | |
| Plaintiffs, | |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | |
| Defendant, | Court No. 22-00063 |
| and | |
| THE AMERICAN LINE PIPE PRODUCERS ASSOCIATION TRADE COMMITTEE, | |
| Defendant-Intervenor. | |

**JUDGMENT**

This action having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now in conformity with that opinion, it is hereby

**ORDERED** that the final results of the U.S. Department of Commerce's first administrative review of its antidumping duty order covering <u>Large Diameter Welded Pipe from Greece</u>, 87 Fed. Reg. 7,120 (Dep't of Commerce Feb. 8, 2022) and the accompanying Issues and Decision Memorandum, A-484-803 (Dep't of Commerce Feb. 2, 2022), are sustained; and it is further

Court No. 22-00063                                                                    Page 2

**ORDERED** that the subject entries enjoined in this action, <u>see</u> ECF No. 11 (order granting Plaintiffs' consent motion for injunctive relief), must be liquidated in accordance with the final court decision, as provided for in Section 516A(e) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(e) (2018).

_____/s/ Leo M. Gordon_____
Judge Leo M. Gordon

Dated: April 28, 2023
       New York, New York

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 23-2094

**Short Case Caption:** Corinth Pipeworks Pipe Industry SA v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes ___13,811___ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 09/29/2023

Signature: /s/ Kristin H. Mowry

Name: Kristin H. Mowry

Save for Filing